12 248
14 62
14 77
14 495
29*1124
35* 226
35* 227
37* 5
12 248
15 555
29*1124
39* 849
12 248
19 561
12 248
21 287
12 248
24 504
12 248
25 376
12 248
e27 97
27 98
e27 256
12 248
28 81
28 82
12 248
d29 220
29 272
12 248
31 465

ARNOLD, RESPONDENT, *v.* SINCLAIR, APPELLANT.

[Submitted April 1, 1892.    Decided May 16, 1892.]

APPEAL— *Transcript — Notice of intention to move for new trial.*— A notice of intention to move for a new trial, setting forth that the motion would be made upon affidavits and a statement of the case, which is inserted in the transcript on appeal from an order denying the motion without being incorporated in the statement of the case, and which shows an acknowledgment of service upon defendant's counsel, will be presumed to have been used on the hearing of the motion in the court below, in the absence of any showing to the contrary, and therefore properly a part of the record under section 298 of the Code of Civil Procedure, providing that on an appeal from an order the appellant shall furnish the court, among other papers, with a copy of the papers used on the hearing in the court below. (*First Nat. Bank* v. *McAndrews*, 5 Mont. 251; *Gum* v. *Murray*, 6 Mont. 10; *Rutherford* v. *Talent*, 6 Mont. 112; *Sweeney* v. *Great Falls etc. Ry. Co.* 11 Mont. 34, cited.)

SAME— *Practice — Settlement of statement — Review of instructions.* — In settling a statement on motion for a new trial, it is not required that the judge shall enumerate and specify each class of matter contained in the statement as settled and allowed, and a certificate " that the foregoing statement on motion for a new trial is a full, correct, and true statement of the evidence in the foregoing case, and is hereby allowed," is sufficient to permit the review of instructions contained therein.

PARTNERSHIP — *Evidence of existence inter se.* — In an action for the dissolution of an alleged copartnership and an accounting, plaintiff testified that more than three years previous to the time when he withdrew from the alleged firm, he and defendant had mutually agreed to thereafter enter into a copartnership; that from the time of such conversation to the time of plaintiff's withdrawal there was no mention of a partnership; that the defendant had purchased the stock for the business which was conducted in his name; that the books were kept by plaintiff, and the business managed by plaintiff and defendant; that defendant had sole charge of the money and kept the bank account; that plaintiff upon withdrawing from the business had accepted and cashed, without objection, a check from defendant upon which was marked " for wages in full to date." The testimony of defendant in denial of the existence of a partnership was corroborated by plaintiff as to every material fact except as to the first conversation testified to by plaintiff, and defendant denied that conversation in his testimony. The conduct of plaintiff during his connection with the business for more than three years contradicted his testimony to the effect that he was a partner. *Held,* that the evidence was insufficient to justify a verdict that a copartnership had been formed and existed between plaintiff and defendant.

EVIDENCE— *Admissions against interest.*—An admission or declaration against interest, especially where no reasonable motive is given therefor, is considered rightly evidence that what a party so states concerning his right or interest is true.

EQUITY — *Finding of jury* — *Section* 250 *of the Code of Civil Procedure con-strued.* — The long established principles relating to the equity functions of the District Courts of this State, respecting the findings of a jury on an issue presented to it in an equitable action, are not changed by the provision of section 250 of the Code of Civil Procedure, providing that " in all cases issues of fact must be tried to a jury," so as to render the verdict of a jury in such cases binding upon the court until formally vacated.

*Appeal from Eighth Judicial District, Cascade County.*

Action for dissolution of copartnership and an accounting. The cause was tried before BENTON, J., who rendered a decree for the plaintiff.   Reversed.

Statement of the facts, prepared by the judge delivering the opinion.

The purpose of this action is to enforce the alleged rights of plaintiff as a copartner with defendant in a wholesale and retail liquor business, and property belonging thereto, which was established at the city of Great Falls, Montana, in August, 1887, and carried on from that date until February, 1891.   Plaint-iff alleges in his complaint that about May, 1887, at Port Arthur, Canada, an agreement was entered into between him-self and defendant, whereby they " mutually contracted, agreed, and promised to and with one another that they would there-after enter into a copartnership between themselves, for the purpose of carrying on, managing, and conducting the business of dealing in, buying, and selling wines, liquors, and cigars, at the city of Great Falls, Montana.   And that it was agreed by and between plaintiff and defendant that the profits accruing in and from said business and copartnership should be divided equally between plaintiff and defendant, share and share alike;" that pursuant to said agreement the plaintiff and defendant in the month of August, 1887, did enter into and form a copartner-ship between themselves, to carry on said business in the place last named, in accordance with the agreement aforesaid, and entered upon the conduct of said business under the firm name of John Sinclair, and from said time continually until Febru-ary, 1891, remained and were copartners in the conduct of said business; that plaintiff duly performed all the conditions of said contract on his part; that defendant at divers times during the continuance of said business invested capital therein, amounting

to the sum of $1,497.30, and devoted some portion of his time and services to the management of said business; that plaintiff devoted his entire time and services to the management and conduct of said business; that said business was successful; that the assets of said firm, consisting of stock in trade, fixtures, furniture, notes, bills, accounts, moneys, and other property, aggregate in value $21,111.11; that debts are owing in relation thereto amounting to $4,320.15; that the net profits earned by the said business during the period of its continuance is $16,790.96, or more; that plaintiff has withdrawn and applied to his own use, out of the net profits of said business, $3,877.13; that defendant has withdrawn from said business $1,497.30, being the whole amount of capital invested therein, and also the further sum of $2,785.85, and converted the same to his personal use and benefit. Plaintiff further alleges that in the month of February, 1891, he withdrew from said firm, and gave notice thereof to defendant, and said copartnership was dissolved; that thereupon plaintiff demanded of defendant that an accounting and settlement of said copartnership affairs and business he had, and plaintiff offered to account and settle the same with defendant; that defendant then and there refused and neglected to account and settle the same with defendant, or to enter upon an accounting or settlement in the premises, and refused to pay over to plaintiff any portion of the assets or profits of said copartnership business, and still refuses and neglects so to do; "that defendant remains in said business, and is in the sole possession of all the assets thereof, and is collecting, and threatens to continue the collection of the debts due said firm, and the proceeds thereof, and to apply the same to his own use, and to utterly deprive plaintiff of any portion thereof;" and that "by reason of the fact that the copartnership business was carried on under the firm name of defendant, John Sinclair, and defendant had possession of all the effects of said firm, it is and will be difficult and impossible for plaintiff to collect any of the debts due said copartnership." Upon the allegations of this complaint, plaintiff asks the usual relief of dissolution of said copartnership firm, as of February 1, 1891; that a receiver be appointed to take charge of all the assets of said firm; that an accounting between himself and defendant,

touching said business, be had under the direction of the court, and the usual practice in such cases; that said business be wound up, its debts paid, and assets distributed according to the respective interests of the members of said firm.

Defendant by answer denies that he ever, at any time or place, entered into said contract, or any contract, to form a copartnership with plaintiff, and denies that he did at any time form such alleged, or any, copartnership with plaintiff, or commenced or carried on said business with plaintiff, as a copartner, and denies that plaintiff has or ever had any interest therein, as copartner or otherwise. The answer specifically denies each and all of the allegations of the complaint, and further alleges by way of new and affirmative matter of defense: "That the only agreement defendant ever had with plaintiff at Port Arthur, Canada, was that at the time mentioned in the complaint defendant there met plaintiff, who was in an impecunious condition, desiring to obtain employment; that at said time defendant had determined upon coming to the city of Great Falls aforesaid, and there starting for himself a liquor business, both wholesale and retail, and that at plaintiff's request defendant engaged plaintiff to act for defendant at said place as his clerk and bartender. That in August, 1887, defendant did open his said business at the place aforesaid, and the plaintiff entered into his employ under and according to said agreement, and continued to act as clerk upon a salary until about the first day of February, 1891, when defendant discharged plaintiff from his employ; had a settlement with plaintiff in full for wages up to that date, and took a receipt in full for the same. That at no time during all of said period did the plaintiff ever intimate, assert, or understand that he had any interest whatever in the said business of defendant, nor did the defendant ever agree to give him any interest therein as salary or otherwise. That the plaintiff and defendant agreed together upon the sum of one hundred dollars ($100) per month as the salary to be allowed the plaintiff for all his services rendered to defendant as aforesaid, and on or about February 6, 1891, the defendant paid to the said plaintiff all that was due him under said agreement; upon which basis a clear and full settlement of all business transactions between the plaintiff and defendant was on said date had, and

the said defendant alleges that he does not, nor did he, owe the said plaintiff any sum whatever at the time of the commencement of this action."

Plaintiff's replication sets forth a denial of all said new matter of defense, and the issues having been settled, a trial was had.

At the trial, by stipulation of counsel and the concurrence of the court, the question whether or not a copartnership was formed and existed between plaintiff and defendant, as alleged in the complaint, was submitted to a jury, who returned a verdict finding in the affirmative, that such a copartnership relation existed. The verdict was approved, and adopted by the court as its finding, and the court proceeded to make the further findings: "That plaintiff and defendant agreed and contracted together, in May, 1887, at Port Arthur, Canada, that they would thereafter enter into and form a copartnership between themselves in the business of dealing in, buying, and selling wines, liquors, and cigars, at Great Falls, Cascade County, Montana; and that the profits to be made in such business were to be shared equally between them, and the losses were to be borne in like manner;" that pursuant to said contract plaintiff and defendant commenced said business on the twentieth day of August, 1887, at said city, and continued the same as copartners under the firm name of John Sinclair until February 1, 1891; that on the last date plaintiff withdrew from said copartnership, and gave notice to the defendant of such withdrawal; and that the moneys, goods, and other assets of said firm were all in the actual possession of defendant; that upon the withdrawal of plaintiff from said firm he demanded an accounting and settlement of the affairs and business thereof, and the defendant refused to allow the same, and refused to pay over to plaintiff his portion of the assets of said firm, claiming the same as his own, and denying plaintiff's title or right of possession, use, and enjoyment of any part thereof, and refused to allow plaintiff any participation in the possession, use, or enjoyment of said business; and that the affairs of said copartnership are wholly unsettled. As a conclusion of law upon the findings, the court declared "that the plaintiff is entitled to a settlement and accounting of said copartnership business and

affairs with defendant, and that he is entitled to the relief demanded in the complaint."

On these findings and conclusions the court entered a decree dissolving said copartnership firm; ordered an accounting touching the business and assets thereof; ordered that a receiver be appointed to take possession of all said copartnership property, with the usual powers of a receiver in such cases, and that he take and keep possession of said property and effects, and sell, convey, transfer, and otherwise dispose of the same, or any portion thereof, when authorized by the court so to do; that he collect all debts and claims owing to said copartnership firm, and prosecute and defend actions respecting the business thereof, and compound or compromise debts owing said firm, when ordered by the court so to do; that the business of said copartnership firm be wound up; that a referee be appointed to take an accounting between plaintiff and defendant touching said copartnership business, and report the same to the court; that, after all debts and liabilities of said copartnership are paid, the residue of property of said firm, or its value, be divided between the members thereof, according to their respective rights therein.

Defendant moved the court for a new trial, assigning as grounds therefor that the evidence was insufficient to justify the verdict, to the effect that a copartnership existed between plaintiff and defendant in respect to said business and property; and that errors in law were committed at the trial in the instructions given to the jury. Said motion was overruled, and defendant appealed from the order overruling the same, and from the judgment.

*Thomas E. Brady,* and *McConnell, Clayberg & Gunn,* for Appellant.

I.  Instructions given to a jury must be taken together and construed as a whole and be consistent. (*Kennon* v. *Gilmer,* 5 Mont. 270; *Territory* v. *Hart,* 7 Mont. 489.) The instructions given are not only inconsistent, but they are essentially defective in this: they make the existence of a copartnership to depend upon the sharing in the profits of the parties to the agreement. Sharing in the profits of a common enterprise is

not the test of the existence of a copartnership. (*Cox* v. *Hickman*, 9 Com. B. N. S. 47; *Parchen* v. *Anderson*, 5 Mont. 438; 51 Am. Rep. 65; *Harvey* v. *Childs*, 28 Ohio St. 319; 22 Am. Rep. 387.)

II. The notice of intention to move for a new trial is properly in the record in this case. In the certificate to the transcript, the clerk of the court certifies that the transcript is a true, full, and correct copy of the notice of intention to move for a new trial used on motion for a new trial. (Code Civ. Proc. § 438.) The statement on motion for a new trial is properly before this court. It was used on the hearing of the motion in the court below, and is incorporated in the transcript as required by section 438 of the Code of Civil Procedure, with the proper certificate of the clerk. The fact that the statement was filed before it was settled and allowed is immaterial. (*Gately* v. *Irvine*, 51 Cal. 174.) It was, however, filed after it was settled and allowed. This is evidenced by the certificate of the clerk, in which he certifies that the transcript contains a true and correct copy of the statement on motion for a new trial on file in his office. A paper is filed when it is deposited with the clerk. (*Tregambo* v. *Comanche M. & M. Co.* 57 Cal. 501.) The instructions were properly and necessarily a part of the statement on motion for a new trial. Errors in instruction are errors in law occurring at the trial. (Hayne on New Trial and Appeal, § 127.) Appellant based his motion for new trial upon errors of law occuring at the trial, and specified that the instructions were erroneous.

III. The certificate to the statement in this case is sufficient under section 298 of the Code of Civil Procedure. It certifies " that the foregoing statement on motion for a new trial is hereby allowed." It is true, however, that it also certifies that the statement contains a full, true, and correct statement of the evidence in the case; but this is not required by the statute, and should be treated as surplusage. What is referred to in the certificate by the " foregoing statement on motion for a new trial" is disclosed by the transcript. The clerk of the court certifies that the transcript contains a true and correct copy of the statement on motion for a new trial used on motion for a new trial.

IV.   The questions raised by the appellant as to the sufficiency of the notice of intention to move for a new trial should not be considered by this court.   The question whether a notice of intention to move for a new trial is sufficient, whether it was served within time, will not be inquired into by the Supreme Court, unless objection has been raised in the court and the objection properly preserved.   These questions should be presented to the court below for determination, and cannot be raised for the first time in the Supreme Court.   (*Rutherford* v. *Talent*, 6 Mont. 112; *Girdner* v. *Beswick*, 69 Cal. 112; *Hook* v. *Hall*, 68 Cal. 23; *Milliard* v. *Hathaway*, 27 Cal. 119; *Godchaux* v. *Mulford*, 26 Cal. 316; 85 Am. Dec. 178; *Hobbs* v. *Duff*, 43 Cal. 485.)   The notice of intention to move for a new trial is not jurisdictional and may be waived.   (*Rutherford* v. *Talent, supra*, and other cases cited above.)   If the notice of intention to move for new trial were not properly in the record, this court would presume, from what appears in the transcript, that the notice was regular and served in time.

V.   Counsel for respondent contend that this is an equity case, and that in an equity case the verdict of a jury is merely advisory to the court, and errors in instructions are immaterial.   We admit that in most of the States of the Union this proposition is correct, but we submit that under our law, and the constitutional provision *that the right of trial by jury shall be secured to all and remain inviolate*, it is not correct.   The first legislative assembly of Montana passed an act providing that chancery cases might be tried by the court with or without the finding of a jury upon issues formed by the court.   (See § 154, Civ. Prac. Act, Bannack Stats.)   This provision was not changed until the adoption of the codified statutes at the seventh session of the legislative assembly, in which section 154 of the Bannack Statutes is not incorporated, and therefore repealed.   It is, however, substantially re-enacted by a provision which provides that "an issue of fact in an action at law shall be tried by a jury, unless a jury be waived or a reference ordered as provided in this act."   (See § 190, Civ. Prac. Act.)   In 1877, at the tenth session of the legislative assembly, an act was passed entitled "An Act to Provide a Code of Civil Procedure in the Territory of Montana," in which it is provided that "in all cases issues of fact

must be tried by a jury (except in actions which involve the settlement of accounts between parties) unless a jury shall be waived by the parties." (See § 241.) This section 241 was subsequently incorporated into the Compiled Statutes of Montana, and is still in force. (See § 250, div. 1.) Thus, it is seen by the history of the legislation upon the subject of the trial of issues that issues in chancery cases were at one time in this State triable by the court, but that afterwards the provision of the statute giving courts the power to try issues in chancery cases was changed and superseded, and all issues of fact were required to be tried by a jury, with the exception stated. This was the law at the time of the adoption of the Constitution, and by virtue of the provision of section 23 of article iii. of the Constitution, which provides that "the right of trial by jury shall be secured to all and remain inviolate," the right of trial by jury still exists in equity cases as well as in cases at law. In the Constitutions of nearly all of the States of the Union, the provision that the right of trial by jury shall remain inviolate is found, and the courts in every instance in construing this provision of the Constitution have held that it preserves the right of trial by jury in all cases in which it existed at the time of the adoption of the Constitution. (*Norval* v. *Rice*, 2 Wis. 22; *Stilwell* v. *Kellogg*, 14 Wis. 461; *Mead* v. *Walker*, 17 Wis. 189; *Tabor* v. *Cook*, 15 Mich. 322; *Whallon* v. *Bancroft*, 4 Minn. 109; *Ross* v. *Irving*, 14 Ill. 171; *Byers* v. *Commonw.* 42 Pa. St. 89; *Howe* v. *Treasurer of Plainfield*, 37 N. J. L. 146; *Murphy* v. *People*, 2 Cowen, 814; *Whitehurst* v. *Coleen*, 53 Ill. 247; *Flint R. S. B. Co.* v. *Roberts*, 2 Fla. 102; 48 Am. Dec. 178; *Copp* v. *Henniker*, 55 N. H. 179; 20 Am. Rep. 194; *Marston* v. *Brackett*, 9 N. H. 336; *Hoitt* v. *Burleigh*, 18 N. H. 389.)

*Cooper & Pigott*, for Respondent.

I. The notice of intention to move for a new trial is improperly attempted to be made a part of the transcript. It has no place there, as it is no part of the judgment roll, nor is it included in any bill of exceptions or statement either on motion for a new trial or on appeal, nor is it one of the papers required to be inserted by the clerk in the transcript. It is not one of

the papers mentioned in section 438 of the Code of Civil Procedure, to be furnished this court on appeal. Nor is it certified in any manner to have been used on motion for a new trial. (*Hook* v. *Hall*, 68 Cal. 22; *Girdner* v. *Beswick*, 69 Cal. 112.)

II. The supposed statement on motion for a new trial should be disregarded, and for two reasons: *First.* It is not included in a bill of exceptions or statement on appeal, nor is it one of the papers mentioned in section 306 of the Code of Civil Procedure as part of the judgment roll, nor is it identified as having been used on the hearing of the motion. *Secondly.* It was not filed with the clerk after settlement, as required by section 435 of the Code of Civil Procedure. The pretended statement was filed July 13th, but was not settled until July 29, 1891. The statement must be settled and certified by the judge before filing. (*Adams* v. *Dohrmann*, 63 Cal. 417.)

III. The instructions should be disregarded for the reason that they are part of the record only because "contained in the statement, which is improperly here, and it would seem that, inasmuch as the appellant failed to state in his notice of intention that his motion would in part or in whole be based upon bills of exceptions, he cannot be heard upon an implied bill of exception." (*Scherrer* v. *Hale*, 9 Mont. 65.) Again, the instructions are not authenticated. (*Raymond* v. *Thexton*, 7 Mont. 306; *Dominguez* v. *Dominguez*, 7 Cal. 424.) Nor will the Supreme Court review the charge in an equity case if the court below disregards the special finding of the jury, and finds the facts for itself, where the special finding is but advisory. (*Sweetser* v. *Dobbins*, 65 Cal. 529.)

IV. There is nothing in the record to show upon what ground the motion for a new trial was made. The notice assigns as a ground for the motion, that the evidence was "insufficient to support the *verdict and judgment* of the court, and that it is against the law. Subdivision 6, section 29 of the Code of Civil Procedure, provides as one of the causes for granting a new trial, "insufficiency of the evidence to justify the verdict or other decision, or that it is against law." Insufficiency of the evidence to justify the judgment is not a ground for a new trial. That a judgment is against law is not ground for motion for a new trial. (*Froman* v. *Patterson*, 10 Mont.

107; *Mazketwitz* v. *Pimentel*, 83 Cal. 450.) It is immaterial in
this case whether or not the evidence is sufficient to sustain the
*verdict.* It would be material whether or not the evidence is
sufficient to sustain the *findings or decision of the court:* The
verdict was but advisory of the conscience of the judge, and
the facts were found by him independently thereof. (*Sweetser*
v. *Dobbins*, 65 Cal. 529.) Nor does the notice of motion
assign insufficiency of the evidence to sustain the *decision* of
the court, which is the facts found and the conclusions of law
drawn therefrom. It does not include the judgment or decree.
(*Coveny* v. *Hale*, 49 Cal. 552; *Sawyer* v. *Sargent*, 65 Cal. 259.)
Conceding to defendant all the inferences in his favor possible
to be drawn from the testimony, there was a substantial conflict
in the evidence. When such is the case, the Supreme Court
will not disturb the decision of the court below. Where there
is evidence to sustain the findings of the trial court, this court
will not disturb its decision, although this court might have
found otherwise if sitting as a trial court. (*Barry* v. *Coughlin*,
90 Cal. 220. See Hayne on New Trial and Appeal, § 288.)

V. It is possible for parties to intend no partnership and
yet to form one. (*Beecher* v. *Bush*, 45 Mich. 193; 40 Am.
Rep. 465, cited in *Parchen* v. *Anderson*, 5 Mont. 438; 51 Am.
Rep. 65.) The parties will not be permitted to testify whether
they regarded each the other as partners, for the construction
of contracts, oral or written, is for the courts. So, while
mutual intention is enough to form a copartnership, the absence
of the intention does not necessarily disprove that relation; and
this is true, because the contract that was entered into may con-
clusively manifest an intent to create a partnership. (*Lintner*
v. *Millikin*, 47 Ill. 178.)

VI. This is a suit in equity. Therefore the finding of the
jury upon the special issue framed is but advisory to the
judge, who may adopt or reject it as to him may seem proper.
If the remedy sought be equitable, the court is not bound to
call a jury, but if it does call one, it is only for the purpose of
enlightening its conscience, and not to control its judgment.
The findings which it must make and the decree which it must
render upon the law and the facts must proceed from its own
judgment respecting them, and not from the judgment of others.

(*Basey* v. *Gallagher*, 20 Wall. 670; *Gallagher* v. *Basey*, 1 Mont. 457; *Mantle* v. *Noyes*, 5 Mont. 274; *Beck* v. *Beck*, 6 Mont. 318.) And hence it follows, that unless the finding of the jury be adopted by the court it is without force or effect, and is a nullity. From these principles it necessarily follows, that erroneous instructions to the jury can do defendant no harm, if justice was rendered him in the finding of the court; and whether the finding of the court upon the issue submitted to the jury does defendant justice, depends entirely upon the facts proved, and not at all upon the verdict of the jury. (*Still* v. *Saunders*, ·8 Cal. 281; *Sweetser* v. *Dobbins*, 65 Cal. 529.)

HARWOOD, J.—Before proceeding to the consideration of the assignments of error made by appellant, some questions of practice, relating to the record, must .be considered. Respondent's counsel contend that the assignments of error on motion for new trial should not be noticed on this appeal, because the notice of intention to move for new trial is not incorporated in the statement of the case, and not being part of the judgment roll, nor included in a bill of exceptions, the notice of intention is improperly inserted in the transcript. The transcript contains a copy of the notice of intention to move for a new trial in this case, showing an acknowledgment of service thereof upon counsel for respondent. The notice of intention to move is the basis of that proceeding, and must set forth the ground upon which the motion will be made, and· " whether the same will be made on affidavits, or the minutes of the court, or a bill of exceptions, or a statement of the case." (Code Civ. Proc. § 298.) It has been held in Montana that such notice of intention is an indispensable part of the record on appeal from an order overruling or granting such motion. (*First Nat. Bank* v. *McAndrews*, 5 Mont. 251; *Gum* v. *Murray*, 6 Mont. 10; *Rutherford* v. *Talent*, 6 Mont. 112.)

But the precise point raised by respondent does not appear to have been heretofore determined in this jurisdiction. The Montana cases, *supra*, appear to have turned upon the point that the notice of intention to move for a new trial was entirely absent from the record. Respondent's counsel cite California cases (*Hook* v. *Hall*, 68 Cal. 22; *Girdner* v. *Beswick*, 69 Cal.

112), which appear to sustain their position. But it appears from Mr. Hayne's work on "New Trial and Appeal" that under the California practice respondent's objection in this case would be of no avail, for, as far as can be gathered from the record, amendments of the statement on the motion for a new trial were proposed by respondent, and there is no showing that objection to the hearing of the motion was made in the lower court, on the ground that the statement did not contain the notice of intention to move.   (Hayne on New Trial and Appeal, §§ 14, 151, 168, and notes.)

It will be further found upon an investigation that the cases from California, cited by respondent, were decided after the adoption of the Code of 1874, which contained provisions different from the former California Practice Act, and those of our Practice Act on this subject.   Mr. Hayne refers to this change, and shows that under the later provisions of the California Code the courts were not warranted in holding that the notice of intention to move for a new trial was properly a part of the record, unless made so by being inserted in a statement or bill of exceptions used on the hearing of the motion : whereas, under the former statute, more nearly like ours at present, the practice was otherwise.   (Hayne on New Trial and Appeal, § 168.)   It is apparent that if the motion is made on affidavits alone, under the provisions of our statute, no statement of the case or bill of exceptions would be necessary to present the matter in the court below, or in the appellate court.   The notice of intention to move would of course be necessary to such proceeding.   (Code Civ. Proc. § 298, and Montana cases, *supra*.)   On appeal from the order, "the appellant shall furnish the court with a copy of the notice of appeal, undertaking or undertakings on appeal, the judgment or order appealed from, and a copy of the papers used on the hearing in the court below, such copies to be certified in like manner to be correct."   (§ 438, Code Civ. Proc.) There might in some cases be difficulty in ascertaining what "papers were used on the hearing in the court below," if contention should arise concerning that point, but that matter could be made certain by a certificate of the judge who heard the motion and made the order setting forth the papers used (*Walsh* v. *Hutchinson*, 60 Cal. 228), but no such contention is involved here.

It is stated in the notice of intention to move for a new trial, among other things, that said motion will be made on a statement of the case and affidavits setting forth newly discovered evidence. And pursuant to that notice two distinct classes of matter were presented in support of the motion. The notice of intention accompanies the affidavits and statement on motion for new trial, and the same are certified to be correct copies of the "files and proceedings had and done in the cause of," etc., giving the title of the action, and such notice being requisite to the proceeding, and among the files, we must presume that the same was one of the papers used on the hearing in the court below, in the absence of showing to the contrary. If no notice of intention to move for a new trial was served and filed, or the same was not served in time, or the one among the files was not the one served, or other irregularity had occurred in reference to such notice, the objection should be urged in the court below as a reason for overruling the motion, and a statement of the grounds and facts supporting such objection should be made part of the statement of the case, and the same could then be heard by the appellate court. (Hayne on New Trial and Appeal, *supra; Sweeney* v. *Great Falls etc. Ry. Co.* 11 Mont. 34.) The notice in the transcript before us appears to have been the notice made and served in this action, and bears the indorsement of acknowledgment of service by respondent's counsel, and as the record shows no reason why it should be disregarded, the objection raised by respondent cannot be sustained.

It is further contended by respondent that the instructions given by the court to the jury on the trial should not be reviewed on this appeal, for the reason that the certificate of the judge who settled and allowed said statement certifies "that the foregoing statement on motion for a new trial is a full, correct, and true statement of the evidence in the foregoing case, and is hereby allowed." Several specifications of error set forth in the statement are predicated on the instructions, and the instructions appear to have been inserted in the statement last preceding the certificate of the judge. The statute provides that, " when settled, the statement shall be signed by the judge or referee, with his certificate to the effect that the same is allowed."

(Code Civ. Proc. § 298.) It is not required that the judge shall enumerate and certify each class of matter contained in the statement as settled and allowed. The instructions are in the statement in this case, as it purports to have been settled and allowed by the judge, and are thereby authenticated as the instructions given, and would be so considered on this appeal; however, the conclusion we have reached, which will be shown below, makes it unnecessary to review the instructions.

The main proposition in this case presented by appellant is that the evidence is insufficient to justify the finding of the jury, which the court approved, and adopted as its finding. On this branch of the investigation the case appears to be somewhat singular. Recurring to the complaint it is observed that the facts therein averred, whereby the alleged copartnership relation between plaintiff and defendant arose, are very meager. The complaint alleges that it was agreed between plaintiff and defendant, at Port Arthur, Canada, in May, 1887, that they "would thereafter enter into copartnership between themselves for the purpose of carrying on said business," which is described; and "that it was agreed by and between them that the profits accruing in and from said business should be divided equally between plaintiff and defendant." It is next alleged "that in pursuance of said contract," and "in accordance therewith, plaintiff and defendant thereafter in August, 1887, entered into and formed a copartnership between themselves in the aforesaid business of dealing in" said goods at Great Falls, "and did then and there, at the time and place last afore-mentioned, in pursuance of said agreement, and in accordance with its terms, engage in and carry on and conduct the aforesaid business of dealing in," etc., "under the firm name and style of John Sinclair," and continued to carry on said business until about February 6, 1891.

The allegations subsequent to the first paragraph, in referring to the terms upon which the alleged copartnership was finally formed, and commenced its existence, states that in pursuance of the first agreement, and in accordance with the terms thereof, the parties entered into copartnership and established said business. Looking back to see what the terms and conditions of said copartnership were alleged to be, it is found that no terms

or conditions are alleged, except that the parties agreed that they would thereafter · form a copartnership to conduct said business, and in addition to this allegation the only condition of said copartnership alleged is that the profits accruing therefrom should be divided equally between said parties. That was a preliminary agreement, as alleged, to the effect that said parties would thereafter form a copartnership for the purpose of carrying on said business. There is no allegation whatever as to the time when the proposed copartnership was to be formed and entered into, or the conditions as to the capital, services, or other valuable contributions, either one, or each, should put into said proposed business when the future copartnership was formed. Nor is it alleged that when they finally formed the alleged copartnership any conditions were agreed upon as to those matters. As to what conditions each party should fulfill in order to establish said business, and share equally the profits thereof, the complaint is silent. The complaint avers that plaintiff has performed "all the conditions of said contract upon his part." As to what he was to do, the complaint is silent. We do not look to the complaint to pass upon the proposition as to whether it alleges facts sufficient to constitute a cause of action, because no such objection has been raised in this court. But we must look to the complaint to find what material facts are alleged and to be proved, whereby the copartnership relation arose, in order to properly consider whether the evidence is sufficient to sustain the verdict that said copartnership existed.

Proceeding to the statement of the evidence, it is found that plaintiff is the only witness introduced on his behalf to prove the allegations of his complaint. He testifies, in effect, that he met defendant Sinclair at the time and place stated in the complaint, and that in conversation defendant stated to plaintiff that he, Sinclair, was just out of business, and spoke about Great Falls, and plaintiff told defendant that Great Falls was going to be a good opening for a liquor business, and that plaintiff would go there if he had any means, but he had no money; that defendant said he could raise $600 or $700, "and wanted to know if we could get a start in a small way on that amount, and said, 'If you will go up there with me, I will give

you one-half interest in the business.' I told him I would.
Defendant said it might take him a couple of weeks before he
could find the money—the $600 or $700;" that plaintiff said
he would go to St. Paul in the mean time, and wait for defend-
ant; and went there and waited about three weeks, when defend-
ant came there, met plaintiff, and bought a stock of liquors and
cigars; that plaintiff took part in arranging for the purchase
of said stock; that defendant paid all that was paid thereon;
that the goods were bought in the name of defendant; that said
goods were invoiced and shipped in the name of Sinclair, by
the direction of plaintiff. Plaintiff explains that he did this
because defendant had paid all the money that was paid for
said goods, and that defendant "was a peculiar sort of man, as
plaintiff knew, and he wanted to let defendant have his own
way." Plaintiff further testified that at St. Paul defendant
said to him, "As soon as we make money enough, I want to
draw out what money I put in, over and above our division of
the profits;" that plaintiff and defendant came immediately to
Great Falls; that said goods arrived about six weeks after the
purchase, a store was rented, and said business commenced, and
thenceforth was carried on in the name of defendant, John
Sinclair; that, on an occasion when said business was removed
from the store formerly occupied to another store, considerable
money had been laid out, and they were hard pressed for money,
and the defendant said to plaintiff, "Can you not write down
to your son and get the money?" Plaintiff replied, "No, my
son has invested all his money in mining property, and I did
not think he had any to spare, but he wanted me to write down
and see if I couldn't get some money for us;" that plaintiff
managed the business, kept the books, and devoted all his time
to it; that defendant was away a good deal of the time hunt-
ing; that defendant had invested a good deal in mines, but the
accounts of such transactions were not kept in the books of the
store, those transactions being all distinct and separate from
said liquor business; that nothing was said about salary from
the time he met defendant at Port Arthur until plaintiff left
there; that the books of said business contained no entry of a
salary account as to plaintiff, and the books were introduced in
evidence to show this fact; that, when plaintiff drew money out

of said business for his personal use, he charged the same to himself.

Plaintiff further testified: "There never was a word of salary mentioned between defendant and me in any conversation. I had some difficulty with him before quitting. I told him it was not satisfactory for me to be in company with any one with whom I could not agree; I said I would choose a man, he could choose a man, and let them take a third man, and whatever they agreed upon I would abide by. He said: 'No, I will give you $100 a month as long as you have been with me.' I said, 'No, sir, I will not accept it.' Nothing further was said at that time. That was the first time salary was ever mentioned. I got money from Sinclair after that, under the following circumstances: I went into Sinclair's some few days after this conversation, and said I wanted some money; I hadn't any. He waited a few minutes and went out, and came back in about half an hour, and sat down and wrote a check and handed it to me. I did not have any words with him because I did not want any argument with him. He is a man that don't reason, in my opinion. Everybody is wrong but himself. I took the check and walked out. Nothing was said between us at that time. I went to the Merchants' National Bank. The check was for $1,650. When I took it to indorse it, I saw on the margin the words, 'in full for wages,' or words to that effect. He didn't call my attention to the provisions of the check. I drew the money on the check. I was out of money and needed money at that time."

Plaintiff further testified that while he was in said business with defendant he kept the books thereof, and used to give defendant a statement every month; that he told defendant how many goods were bought and sold; that in ordering goods, plaintiff did not give orders without consulting defendant Sinclair; that since the commencement of said business he had personally made out the orders for goods; that said orders were always made in the name of Sinclair, personally, by plaintiff, and plaintiff signed defendant's name to such orders, "per Arnold." Copies of such orders were introduced in evidence, on cross-examination of plaintiff, identified by him as his writing, and in all cases the same were made out in the name of John

Sinclair, and signed, "John Sinclair, per Arnold." Plaintiff testified that the orders introduced in evidence were a fair sample of all orders as he usually sent them out; that nothing was ever said between them as to the firm name in which said business should be carried on; that it was commenced in the name of John Sinclair, and was carried on in that name; that defendant never consulted plaintiff when he went away from home; that, when defendant was at home, plaintiff consulted him about the advisability of selling goods on time, and giving credit; that nothing was ever said between plaintiff and defendant as to when the proposed copartnership between them was to be commenced, or the time when the agreement to go into partnership, which plaintiff alleged was entered into at Port Arthur, was to take effect; that defendant Sinclair during all the time said business was carried on, had sole charge of the money of said business, kept the bank account, and was the only one that had authority to draw checks thereon; that in one or two instances, when defendant was away from home, plaintiff had occasion, for some urgent reason, to draw a check on the bank against defendant's account, which he did, signing the name of defendant thereto by himself, and immediately went to the bank and explained the matter and the necessity for drawing the check, in order to have the same honored. Plaintiff says: "I left Sinclair on the 5th or 6th of February, 1891; and during the time said business was carried on prior to that, for upwards of three years that I was in business with Sinclair, Mr. Sinclair alone signed the checks on the bank account."

The check of $1,650 paid by defendant to plaintiff, as above mentioned, was introduced in evidence. The same bears date February 9, 1891, was drawn upon the "Merchants' National Bank of Great Falls, Montana," and reads, "Pay to P. Arnold, or order, sixteen hundred and fifty dollars. $1,650." "For wages in full to date." Signed, "John Sinclair." Indorsed, "Peter Arnold." "Paid February 9, 1891, Merchant's National Bank of Great Falls, Montana." Plaintiff acknowledges the receipt of said check, and the indorsement thereof; that he obtained the money called for thereby, and that he saw the words, "for wages in full to date," written upon said check, before he obtained the money thereon; that he did not go back

to Sinclair to have said words erased, or to make any remonstrance against taking said check, with said conditions written thereon.

On cross-examination, plaintiff testified that: "The first time I made mention to Sinclair about claiming a partnership in his business was about February 1, 1891. We had had no arrangement since we left Port Arthur. There was no mention made about business or partnership or salary or anything else, anywhere. The occasion of dissolution of this peaceable partnership between Sinclair and myself was that there was a certain party coming there (he objected to somebody getting goods there), and I told our bartender to sell to anybody who had the money to pay for them. Sinclair objected to this party coming there, and I said, 'As long as he has got the money, let him have the goods.' The clerk was Dick Williams, and that was about the last of January. I think Sinclair went away after that row — the next day after. I staid there until after his return — a week or ten days, perhaps two weeks. I told him in the mean time I had got quite an order in for goods, and this Williams was drunk all the time, and had had a fight, and I told Sinclair we had better get another man. I said, 'He is a good man to work, but we can't trust him. He is out every night, and getting into a fight.' That that morning he was drunk, and couldn't do any work. Then Sinclair began to pitch into me;" that this was the first time there was ever any contention between plaintiff and defendant.

On being asked why, if plaintiff claimed to be an equal partner in said business, he did not discharge said Williams from the employment of said firm without consulting Sinclair, plaintiff answered, saying: "I did not want to discharge him without getting another man. I said, if he knew of a good man, we had better get him." On being questioned, on cross-examination, about his alleged offer to arbitrate the differences between plaintiff and defendant, plaintiff said: "This conversation took place in the store. I think none were present but Sinclair and myself. Dick, the bartender, may have been back behind the bar. It took place before I got the last check. The conversation was had in a moderate tone of voice, just as I am now talking. Sinclair said, 'No,' and that was all. I

think it was at that time Sinclair first said anything about pay-
ing me wages.   I think it was at that time he said he would
pay me $100 a month.   I said, 'No.'   I refused it.   I did
not make mention then that I claimed a partnership.   I sup-
posed he understood that.   What I referred to in my proposi-
tion for arbitration, as I supposed it, was my interest in the
business, although nothing was said particularly about that.
But I did say I would not accept a salary."

Plaintiff further testified, on cross-examination, that "on or
about the twenty-ninth day of May, 1890, I may have had a
conversation with W. H. Race, a justice of the peace of this
town, as to who composed the firm of John Sinclair, or whether
or not it was a firm.   He might have asked me the name of
the firm, and I might have said, John Sinclair.   I remember
of bringing a suit against the firm of Talgo and Anderson in
the name of John Sinclair, on one of our bills."   The under-
taking on attachment in said case was introduced in evidence,
and shows that the case was brought in the name of "John
Sinclair, plaintiff," and said Peter Arnold, the plaintiff in this
action, appears as one of the sureties on said bond.   The affi-
davit for attachment was also introduced, and shows the name
of "John Sinclair, plaintiff," and it is recited therein that:
"Peter Arnold, being first duly sworn, says he is agent for the
plaintiff in the above-entitled action."   Said affidavit appears
to have been subscribed and sworn to by Arnold, the plaintiff
in this action.   On being questioned as to the reason he brought
said action in the name of John Sinclair alone, without stating
his own name as a plaintiff in interest, or a member of the
firm of John Sinclair, if it was a firm and he was a partner in
said business, the plaintiff in this action, Arnold, said: "The
explanation I have as to the reason why I swore that I was
agent of John Sinclair is that we wanted to save expenses.
I never looked at or thought particularly about it.   That was
the way I did it.   I do not know but Judge Race suggested
himself to do it that way.   I certainly signed it, and I see it was
sworn to, but I never looked to see what it was.   I am not
quite sure whether or not I had any conversation with W. H.
Race, or he with me, previous to the first writ of attachment
in the court of W. H. Race, in relation to who composed the

firm of John Sinclair. I do not recollect any conversation with him at all. I signed that paper as bondsman. I did all the business that way because some one had to sign. Sinclair was not in the habit of signing. He was away a good deal, and I did it that way just to avoid the trouble of having to get him to sign." Plaintiff rested his case upon his own testimony.

Defendant Sinclair was sworn, and testified on his behalf to the effect that he had heard plaintiff's testimony as to the conversation and agreement between himself and plaintiff at Port Arthur, Canada, in relation to going into the liquor business; that very little was said on that subject between them; they were talking together of Great Falls, when plaintiff said he would like to go there, and defendant asked him "if he had money enough to take him up, and that was about the sum and substance of the conversation;" there was no other conversation had then about the business; that plaintiff went to St. Paul, just as he related, and defendant went there a little later; that no arrangement was made at all between plaintiff and defendant at St. Paul about plaintiff's coming to Great Falls; that plaintiff was about with defendant while the latter was in St. Paul; and defendant learned there that plaintiff did not have money enough to take him to Great Falls; that defendant bought and paid for a suit of clothes for plaintiff; that neither at Port Arthur, Canada, nor any other place, did defendant have any conversation or agreement with plaintiff, whereby defendant agreed to take plaintiff in as a partner in said business on condition that defendant was to furnish the money for the business and give plaintiff one half of the profits thereof; that plaintiff Arnold was merely acting for defendant as clerk, but no arrangement was ever made as to what compensation Arnold was to receive, prior to the final settlement, when defendant paid him said check for $1,650; that after said settlement defendant learned for the first time that Arnold claimed an interest in said business; that defendant heard plaintiff relate a conversation in which he claimed that he offered to arbitrate with defendant as to a settlement; that defendant could not recall just what was said at that time, but that "Arnold had not at that time, or any time previous, made any claim whatever to any interest, or intimated to me that he

did claim any interest in my liquor business; nor did plaintiff ever make any claim to such interest until after the giving of said check for $1,650;" that Arnold never had any interest in said business, and never acted therein otherwise than as an employe; that the business was conducted solely in defendant's name, and he had sole control of said business, and all the funds and bank account thereof; that plaintiff Arnold never put any money into said business; that trouble arose between the bartender and Arnold, and the latter wanted defendant to discharge said bartender, but that the defendant had come to the conclusion that he would discharge Arnold, and did so; that then Arnold did not claim to have any interest in said business, but asked defendant when he would pay him; that this occurred on the 6th of February, and on the 9th of February defendant paid plaintiff said check for $1,650 in full settlement; that there was never any partnership business or agreement existing between plaintiff and defendant at any time in relation to said business.

On cross-examination, defendant testified substantially the same as in chief, so far as he was questioned. He goes further into details as to the reasons he had for discharging plaintiff from his employ, as he claims, which reasons do not concern this inquiry. He further stated that he paid Arnold's fare from Helena to Great Falls, when on their journey from St. Paul to Montana, and also paid for some of his meals while on that journey.

W. H. Race was called as a witness for defendant, and testified that on May 29, 1890, while he was justice of the peace at Great Falls, within and for Cascade County, the plaintiff in this action, Arnold, brought the suit referred to above in his court; that he, Justice Race, supposed said liquor business was carried on by a firm; he did not know why he had this impression; that when said suit was brought he asked Arnold who composed the firm, and Arnold replied, "John Sinclair." The justice said in his testimony: "The reason I gave him for asking that question was simply that the names of all interested parties must be incorporated in the summons." That thereafter quite a number of suits were brought by Arnold, and the papers were always made out in the name of John Sinclair, the

same as the first one. That when the attachment suit was brought, of which the affidavit and undertaking were introduced on this trial, Sinclair was not present. That Mr. Arnold said Sinclair was out in the mountains, but that he, Arnold, could make the affidavit as agent for plaintiff Sinclair in said attachment suit.

Defendant having rested in his proof, the plaintiff again testified briefly on his own behalf, in rebuttal, and said: "I heard the testimony of Sinclair, giving the reason why he discharged me, and the word, 'discharge,' was not used at all. He gave me to understand that I should have $100 a month if I chose to stay, but I did not accept. He did not say anything at all to indicate that he wanted me to go." He then goes into some explanation as to the facts which defendant had asserted as reasons for discharging him. This matter, however, as before asserted, is not material to our inquiry. Plaintiff stated that he did not remember whether defendant paid for a suit of clothes for him at St. Paul, or not, but said, "I may have said, 'Pay for both suits,' or something to that effect. I had money, but not enough to put into the business. I told him I had about enough money to pay my expenses to Great Falls. I think he paid the stage fare from Helena. I stopped three weeks in St. Paul, waiting for him, which took some of my means." Plaintiff gave no testimony in rebuttal in reference to what the justice of the peace testified.

The testimony in this case shows that the defendant is corroborated by plaintiff in every material fact testified to, except on the one assertion of plaintiff, that at Port Arthur, Canada, defendant told him that, if he would go with defendant to Great Falls, defendant would give him one-half interest in said business. Plaintiff testified, on cross-examination, that after the conversation at Port Arthur there was never any other conversation or arrangement about said business between plaintiff and defendant. In this connection, plaintiff said that "the first time I made mention to Sinclair about claiming a partnership in his business was about February 1, 1891. We had no arrangements since we left Port Arthur. There was no mention made about business or partnership or anything else, anywhere." This corroborates defendant, and refers the dispute as

to what agreement plaintiff and defendant had back to the conversation had at Port Arthur, Canada, in May, 1887. It contradicts the allegation in the second paragraph of the complaint that "plaintiff and defendant, in the month of August, 1887, did enter into and form a copartnership between themselves in the aforesaid business, dealing in" said described goods "at said city of Great Falls." Therein plaintiff also contradicts his prior statements as to what defendant said at St. Paul about drawing out what capital he put into the business before profits were divided.

All the conduct of plaintiff while engaged in said business, for more than three years, contradicts his testimony to the effect that he was a copartner therein, or an owner of one-half interest in the profits thereof. According to his own assertions he was a man of mature years, and of long experience in business, and defendant was "a peculiar sort of man," and of arbitrary temperament. Plaintiff was constantly engaged in attending to the affairs of said business during that long period; kept the books, gave orders for goods, brought suits to enforce collection, and during this whole period carefully avoided doing anything, or asserting anything, wherein he assumed the attitude of a copartner or owner therein. Moreover, by conduct and by expression, he asserted the contrary. In solemn proceedings, when the question was put to him as to "who composed the firm," he replied, "John Sinclair," and Justice Race testified that "the reason I gave him for asking that question was simply that the names of all interested parties must be incorporated in the summons." In this the justice was right, and sought to have the proceedings instituted according to law. (Code Civ. Proc. §§ 15, 16.) Arnold also assumed the character of surety for plaintiff Sinclair in that proceeding, which was improper if he was a party in interest. But this was not all. In his affidavit for the attachment, he deposes that he was agent for Sinclair, the plaintiff in that action. This occurred in May, 1890, over two and one-half years after the commencement of said business, and the case was brought to make a collection for said business, in which Arnold now claims to have been a copartner from its commencement. He explains in his testimony that his attention was not called to the contents of

said affidavit, and that he paid little attention to it. He also says he adopted that course in said proceedings before the justice to save expense. This is contradicting himself, for if he did the business in that way to save expense, he paid attention to it — he thought of it — and did it premeditatedly. Besides, it is inconceivable how expenses could be saved by stating untruly to the justice his relation to said business, or swearing that he was agent for plaintiff Sinclair, instead of transacting the business as a copartner, in which relation he would have as much authority concerning said business as Sinclair himself. In this instance the truth would have been as cheap and convenient as solemn prevarication, and the reason he attempts to give for not stating the truth is empty of all force, and is contradictory. The justice of the peace also contradicts him in this respect, for he says that Arnold explained on the occasion that Sinclair was out in the mountains, and that he, Arnold, could swear to the affidavit as agent of Sinclair. This shows that Arnold considered the whole situation, and considered the source of his authority to act, whereas, he says in his testimony that he thought very little about it. Men are not likely to understate their rights, especially in relation to property. For this reason admissions or declarations against interest, especially where no reasonable motive is given for such conduct, is considered weighty evidence that what a party so states concerning his right or interest is true.

When plaintiff had occasion to draw a check on the funds of said business in the bank he was unable to do so, without apparently exceeding his authority, or without going to the banker and arranging to have the check honored, on the faith that Sinclair would ratify the act of drawing it. Under these circumstances plaintiff is never found to have intimated that he was a copartner and owner of one half of the profits of said business. When plaintiff had a controversy with the bartender he did not discharge him. However, it might have been the conduct of a prudent man, even though he was a partner in interest, to have consulted the other member or members of the firm in that respect. But, when he went to Sinclair about this matter, he did not demand that said bartender should be discharged. He did not insist upon it as a copartner who had

authority in this matter. He complained of the bartender to defendant, and when the latter told plaintiff he had made up his mind to discharge him, plaintiff went away, or, even adopting plaintiff's own testimony, that the word "discharge" was not used, but that defendant "gave plaintiff to understand that he should have $100 a month if he chose to stay," and that they had words, not of a peaceable nature, or, as plaintiff terms it, "a row," still plaintiff made no affirmation concerning his claim to a partnership interest, nor even made an intimation of it, on that occasion, according to his own account. It appears that plaintiff then left the establishment, and the bartender was retained, and in two or three days plaintiff returned—he says, "I went into Sinclair's"—and asked Sinclair for money, and he received a check for $1,650, on which was written "for wages in full to date." Plaintiff says that he needed money, and although these words were on said check, and he was dissatisfied with them, he drew the money. And yet he said the check, with that condition written on it, was not satisfactory to him; that it "was satisfactory for the money," but the condition was unsatisfactory. Sinclair had already told him that he would pay him $100 a month, according to plaintiff's testimony, at the very time plaintiff offered to arbitrate, and defendant refused to arbitrate, saying he would settle it himself, and "I think it was at that time," says the plaintiff, "that he said he would pay me $100 a month. I said, 'No.' I refused it." Nothing was then said by Arnold about his claim or supposition that he had an interest in said business. Nor had any intimation been made to that effect before, and all of Arnold's conduct and expressions which were proved was to the contrary effect. Now, what did Arnold presume that check for $1,650 was given to him for, as Sinclair understood it? Without reference to the words, "wages in full to date," written thereon, the fact that defendant had told plaintiff he would pay him $100 a month was sufficient that that was the basis upon which defendant was paid said $1,650, and still plaintiff made no remonstrance whatever, nor even at this late date, after he was out of the concern, did he say a word about his claim of an interest therein, unless it was said in the conversation wherein Arnold testified that he offered defendant to arbitrate their differences. Arnold testified as to

that conversation in his examination in chief, and stated particularly that defendant made no denial on that occasion of the fact that plaintiff owned an interest in said business. The tendency of his testimony on this point, as given in chief, was that Arnold made the proposition to defendant Sinclair to arbitrate for the settlement and division of their respective interests in said business as copartners. But, when we come to Arnold's cross-examination on this point, he says: "The arbitration that I offered to submit to Sinclair was for the purpose of having a settlement of the books and accounts, and whatever they said they were worth I would abide by. . . . . I think it was at that time that Sinclair first said anything about paying me wages. I did not make mention then that I claimed a partnership. I supposed he understood that. What I referred to in my proposition for arbitration, as I supposed it, was my interest in the business, although nothing was said particularly about that." Just before these statements, plaintiff had stated that "we had no arrangement since we left Port Arthur. There was no mention made about business, or partnership, or salary, or anything else, anywhere." Why then should defendant have denied that plaintiff had any interest in said business on the occasion of the disruption between plaintiff and defendant, when it had never been even intimated that plaintiff claimed such an interest during the whole course of said business, nor was it then intimated, according to plaintiff's testimony? Do men usually deny matters concerning their affairs, the existence of which has never been mentioned, and upon which utter silence is maintained, even at the crisis when of all times a man would be moved to declare his rights as he believed them to be? Again, why did plaintiff go away and break off his participation in said business if he was a half-owner therein? If the position he afterwards assumed, and undertakes to support by this action, was true, he was then owner of one-half interest of said business and property concerned therein, and he says in his testimony, in rebuttal, that on said occasion of the contention between himself and defendant the latter "did not say anything at all to indicate that he wanted me to go." Why then did plaintiff go, and leave his property in the hands of an untrustworthy bartender, and a copartner who assumed to own every-

thing in the concern, when there was no coercion? These are hopeless questions, as shown by the case, and they are only propounded to bring out in strong relief the conditions involved.

Counsel for respondent have made an able presentation on his behalf, considering the brittle material they had to work upon when it came to the merits. They urge that this is a case of conflict of testimony, and the triers before whom the witnesses appeared must decide between them. Where is the conflict? Only as to what expressions were used by these parties at Port Arthur. As to that, does not all of plaintiff's conduct for over three years contradict him? Did he not expressly, by assertion to Justice Race, when the matter was brought squarely to his attention, in a matter which demanded the truth as he understood it, in effect, contradict what he says was agreed at Port Arthur? Did he not by affidavit, in effect, contradict that by that agreement and by subsequent acts he was made a joint owner? Defendant is corroborated by even the plaintiff substantially on every point, except the one sentence which is attributed to defendant in conversation at Port Arthur, and plaintiff, by conduct, by expression, and by silence when a man naturally would have spoken, during a period of more than three years, contradicts that. It is needless to dwell further on the condition of this case brought out by the testimony. It all tends one way in fact when the record of the evidence is read and considered, and we have no hesitation in affirming that the verdict returned by the jury and adopted by the court is without evidence sufficient to justify it.

We observe that in addition to adopting the finding of the jury the court found, among other things, "that on or about February 1, 1891, plaintiff withdrew from said firm and copartnership, and thereof gave defendant notice." We have quoted from plaintiff's own testimony, showing that the proof is just the contrary of that finding. It is further found by the court that: "Upon the withdrawal of said plaintiff from said firm, he demanded of defendant an accounting and settlement of said copartnership affairs and business, and offered to account and settle the same with defendant, but that defendant then refused and yet refuses to account or settle the same or any part thereof." The record is not only barren of testimony to

support that finding, but the testimony of plaintiff himself proves the contrary against him, for he says nothing whatever was mentioned when he left the institution, or before that, about his claim of an interest in said business, or a copartnership interest or relation, nor that he gave notice of withdrawal therefrom, but he says he supposed defendant understood that it was the partnership affairs that plaintiff proposed to arbitrate, although nothing was said about a copartnership interest. These findings were not attacked on this appeal. There was no need for attacking them, for, being auxiliary to the finding that there was a copartnership, they would fall with that finding, if it was not supported. We only refer to them as showing with what inadvertence to the real state of the evidence the findings were made up.

Some argument has been put forward in this case as to whether, by reason of section 250 of the Code of Civil Procedure, the court was not bound by the verdict of the jury, and thereby compelled to accept and proceed upon it until a formal proceeding was had to vacate the same. Even though under that statute the parties had a right to demand that the issue of the existence of a copartnership between plaintiff and defendant respecting said business be submitted to a jury (a proposition which we do not now decide, because it is unnecessary in this case), still we do not find anything in that statute which indicates an intention to change, or trench upon, the equity functions of the court respecting the finding of the jury on an issue presented to it in an equitable action. If such intention was manifest in said statute, the question would then arise whether the legislature had power, considering the organic act under which the legislature existed when said statute was passed, to make such change in the equity power of the court; and the further question whether under the provisions of our Constitution such a statute could have effect. But no such intention is expressed directly, and it would seem to be a violent presumption to conclude that the legislature intended, in the absence of direct expression to that effect, to change the long-established principles which governed courts of equity jurisdiction in dealing with the finding of the jury upon an issue presented to it, in an action relating to the equitable rights

and interests of parties. (*Brown* v. *Buck*, 75 Mich. 274; 13 Am. St. Rep. 438; *Carpentier* v. *Montgomery*, 13 Wall. 480.)

The conclusion of this court is that the finding of the jury should have been set aside by the judge, and upon the evidence he should have found that no copartnership relation was proved to have existed betweeen plaintiff and defendant in respect to said business, or the proceeds or property thereof. This not having been done, it is our opinion that the court should have set aside the verdict and finding on the motion for a new trial, when the matter was formally presented, with opportunity to fully review the evidence. Upon this appeal appellant asks that relief, and in our opinion it surely should be granted. All the findings of the court subsequent to the approval of the verdict of the jury are auxiliary to and rest upon the verdict, and necessarily fall with it. So that the appointment of a receiver in said action will then rest solely upon an *ex parte* showing, which upon trial has been found wanting in proof to sustain it. In such a case the appointment ought not to be allowed to stand where the proceedings virtually destroy the business, and result in great and unjust damage, if the action is not well founded, unless the plaintiff assumes effectually a position of responsibility to answer for such damage, in case the action is found to be "without sufficient cause." (§ 231, Code Civ. Proc.)

The order of this court will therefore be that the finding of the jury, approved by the court, be set aside and vacated; that the decree entered thereon be reversed, and a new trial granted; and, further, ordered, that unless a good and sufficient bond has heretofore been filed by plaintiff for the appointment of a receiver in said action, as provided in section 231 of the Code of Civil Procedure, plaintiff shall, within ten days from the filing of the *remittitur* and this order, make and. file with the clerk of the court below a good and sufficient undertaking in double the amount of the value of the property belonging to said alleged copartnership firm, as stated in the complaint, with good and sufficient sureties, to be approved by the court in which the action is pending, and conditioned as provided in section 231 of the Code of Civil Procedure of this State. That, in default of filing such undertaking within the time prescribed in this order, the court below is directed to cause the receiver in

said action, as well as all others who have been put into possession of any effects or other valuable things belonging to the business and estate in controversy (except such as may have bought property outright through lawful sales by said receiver), to deliver over and surrender to defendant's possession all of the property, funds, choses, books, papers, and other things pertaining to said business and estate, which have come into his or their possession or control through the proceedings had in this action, and that as complete restitution be made to defendant of the property, funds, and other possessions, of which he may have been dispossessed by proceedings in this action as is possible by the just and effectual orders of the court below; that the receiver and others in charge of said property or funds, or any part thereof, be required to file his or their reports in court, showing full account of their conduct touching the same. (§ 441, Code Civ. Proc.)

*Reversed.*

BLAKE, C. J., and DE WITT, J., concur.