## J. R. SANFORD, RESPONDENT, *v.* GATES, TOWNSEND & CO. AND FLORENCE K. GATES, APPELLANTS.

[Submitted May 23, 1898.    Decided July 5, 1898.]

*Conditional Sales—Remedy—Contract — Rescission — Reformation—Remedy—Equitable Defense—Findings by Court.*

1. CONDITIONAL SALES—*Remedy.*—The predecessor in interest of the defendants agreed, in writing, with the plaintiff, that he had hired of plaintiff certain personal property, for which he agreed to pay the sum of $649 as rent, as follows: $50 per month until the full amount with interest should be paid. It was further provided in the agreement that the title should not pass until the sum above mentioned had been paid, that in case of default in payment plaintiff might take possession of the property, and that all money theretofore paid should be forfeited as damages for the use of the property. *Held*, that, upon default in payment, plaintiff was entitled to the possession of the property.

2. RESCISSION OF CONTRACT.—A party to a contract cannot have a rescission thereof, unless he offers to return all that he has received thereunder, or shows some valid excuse for his failure so to do.

3. CONTRACT—*Reformation of.*—A contract which does not express the true intention of the parties, may be reformed at the request of a party thereto who, although he understood the terms thereof, was led to sign it by the fraudulent misrepresentations of the other party upon which he relied.

4. SAME—*Remedy.*—A party to a written contract who claims that it does not correctly state the true terms of the agreement, and that he was led to sign the same by the fraudulent misrepresentations of the other party thereto, cannot recover upon the oral agreement, but must first have the written agreement reformed; recovery cannot be had upon an oral agreement differing in its terms from the written evidence of it made by the parties.

5. SAME.—To warrant the reformation of a contract because of deceit by means of false representations, it must appear that the party seeking the reformation was induced by the false representations to enter into the contract.

6. EQUITABLE DEFENSE—*Finding by Court.*—Where an equitable defense is interposed, the court has the power and jurisdiction of a chancellor, and may submit issues of fact to the jury, or may refuse to do so, and direct a verdict even where the evidence is conflicting.

*Appeal from District Court, Lewis and Clarke County; H. R. Buck, Judge.*

REPLEVIN by J. R. Sanford against Gates, Townsend & Co. and another. From a judgment for plaintiff, and an order denying a new trial, defendants appeal. Affirmed.

*Toole & Wallace*, for Appellants.

*T. J. Walsh*, for Respondent.

PIGOTT, J. The complaint alleges, in substance, that the plaintiff is the owner and entitled to the possession of certain hotel furniture of the value of $649.06; that the same is unlawfully held by defendants, after demand therefor; that on October 2, 1893, plaintiff delivered the chattels in controversy to defendant Gates, Townsend & Co., a corporation, under the provisions of a contract entered into on that day between plaintiff and defendant corporation, as follows:

"Helena, Montana, Oct. 2, 1893. I have this day rented of J. R. Sanford the following described goods as per memorandum attached, for which I agree to pay him as rental $649.06 as follows, viz.: Fifty dollars on the first of each month until the whole amount of $649.06 is paid, together with interest at 1 per cent. per month on all unpaid balances; the interest to be paid monthly. And it is further expressly understood and agreed that the title to the above described goods shall not pass to me until I have paid an amount of rental equal to $649.06, as herein provided; and that the same shall be and remain the property of the said J. R. Sanford until the same shall be fully paid. And in case I make a default in my payments, as herein provided for, or any part thereof, I hereby grant and give to said J. R. Sanford or his agent or employee the right and privilege to enter on my premises and into my house or place where the goods may be, and take possession of said goods without process of law. In case I make default in said payments, or any part thereof, it is expressly agreed and understood that all sums paid by me prior to such default shall be, and the same is hereby, forfeited as a part of the damages sustained by said J. R. Sanford for the use of the goods belonging to said J. R. Sanford,

in the event of my failure to perform the terms of this agreement. And I further agree that I will not remove the goods, or allow them to be removed, from the street and number as herein given, without the consent of the said J. R. Sanford. If so, I agree to forfeit all that has been paid on them, and return the goods to J. R. Sanford or his agent. When the amount herein specified shall have been fully paid, with interest as agreed upon, then the said J. R. Sanford shall, if required, give a bill of sale for the goods herein mentioned. [Signed] Gates, Townsend & Co., per A. R. Gates, Pres. Payments on above contract to commence in the month of January, 1894. J. R. Sanford."

That afterwards the defendant assigned to its co-defendant all its interest in the property. That on September 2, 1894, there fell due as interest $2.50, which remains unpaid, and that on October 2, 1894, the sum of $50, with further accrued interest of $2.50, became due, and was not paid. That there was due and unpaid October 4, 1894, when the complaint was filed, the sum of $55, and that the additional sum of $150 had not then matured.

The answer admits that the chattels were delivered and received in pursuance of the contract set out in the complaint. For an equitable defense defendants plead that at and before the making of said contract one Rohrbaugh was renting from defendant corporation the Grandon Hotel, and had possession of and was using the chattels as part of the furniture of the hotel under some agreement with plaintiff, the terms of which were unknown to the defendants, that Rohrbaugh was then indebted to defendant company to the extent of $1,800 or thereabouts, and was insolvent, and unable to pay any part of such debt, except by a transfer of his interest in the said chattels, and that there was then due, or to become due, from Rohrbaugh to plaintiff, the sum of $449.06—all of which plaintiff knew; that defendant company agreed to execute a contract in writing to pay plaintiff whatever was due, or to be paid by Rohrbaugh to plaintiff for the chattels, and thus become the owner thereof; that plaintiff and Rohrbaugh conspired to-

gether to defraud and cheat the company, and to carry out their wicked purpose fraudulently represented to the said defendant that there was due and to fall due from Rohrbaugh to plaintiff the sum of $649.06, instead of the real sum of $449.06, which latter was the amount defendant of right ought to pay to obtain title to the property; that the defendant company relied upon said fraudulent and false representations, and believed them to be true, and had no information or means of information to the contrary, and that it therefore executed the contract to pay $649.06, whereas, the amount should, in truth and fact, have been $449.06. It is further averred that defendants, before the commencement of this action, had paid in full the $449.06, which was the whole amount payable by Rohrbaugh, and that by reason of the said payment they are entitled to the property. They pray that the contract pleaded in the complaint be declared void; that an accounting be had according to the agreement of the parties; that the defendants be decreed the owners and rightfully in the possession of the property; that if, on an accounting, anything be found due the plaintiff, defendants be permitted to pay the same into court, which they offer to do; and ask for general relief. No issue was made as to value. For convenience we shall, in this opinion, treat the company as the only defendant.

The defendant, upon whom rested the burden of proof, introduced evidence. Plaintiff then moved the court to direct the jury to find for plaintiff on several grounds, one being that defendant had failed to show that it had relied upon or believed the false representations made by plaintiff to it; and another being that there was no evidence that the amount due from Rohrbaugh had been paid. The motion was granted upon the first ground mentioned, a verdict returned, and a judgment signed and entered accordingly. From the judgment, and from an order refusing a new trial, defendant appeals.

With two exceptions, every material allegation of the equitable defense was, *prima facie,* clearly established. The evidence disclosed that $12 or thereabouts were still unpaid on the

contract between plaintiff and Rohrbaugh, this deficiency being occasioned by an erroneous calculation of the interest. This is one of the exceptions. The other is the allegation that the defendant believed the false representations of plaintiff, and relied upon them at the time he entered into the contract with him.

The following quotations are extracts from the testimony of Gates, president and managing officer of defendant: "I was to pay for this furniture just what balance Rohrbaugh owed Sanford. Sanford said all he wanted was his pay for this furniture. I then entered into the contract sued on. Plaintiff had made out before that time, and given me, a statement of Rohrbaugh's account. He said this was the amount due." Witness produced itemized bill, showing $649.06 as due from Rohrbaugh to plaintiff. "I have had this account in my possession ever since. I went to plaintiff, and told him I did not think that account was right, and I would like to see his books, as I had assumed the balance Rohrbaugh owed him. He informed me that he would not let me see the books; he would not let any man see his books, he did not care who he was. I had no other means of knowing, except through the statements of Rohrbaugh and Sanford, what amount was due.' Question: 'Did you accept the statement as true, and act upon it?' Answer: 'I accepted it under protest. I told Sanford I didn't think the account was right. I says, 'There have been other payments made.' 'Well,' says he, 'if there has been any other payments made on that account, Adam (meaning his clerk) got it. I never got it.' This was at the time he refused to permit me to look at his books. I asked Sanford how much Rohrbaugh owed him. He said he couldn't tell until he had looked up his account. Said I, 'Did he keep up the payments? 'Yes,' he said, 'he did promptly; very good; better than I expected.' That afternoon Sanford came to the hotel with the statement given in evidence. I looked at it and says: 'That can't be right. You told me he kept up his payments very well.' I says, 'This shows no payments made since the 1st of May,' and I says, 'Rohrbaugh told me he had

kept up his payments, and that was one reason why he could not pay his rent—he had to pay so much for furniture.' 'Well,' he says, 'if there has been anything more than that paid, Adam got it. I never got a cent.' I objected. I did not like to pay that amount.    *    *    *    I said, 'Whatever is due legally, I am willing to pay; but I don't want to pay any more.' Then he said, 'You just sign this contract, and if we find there is anything wrong, or anything paid in outside of this, we will rectify it in the end.' I immediately signed the contract. Rohrbaugh had previously stated to me that there was about $400 due on it. I do not know where Rohrbaugh was at the time of this conversation with Sanford. Mr. Sanford at that time would not permit me to see his books, and insisted upon my signing the contract exactly as it was. He says, 'You sign this.'    *    *    *    The statement given me originally by Sanford showed a balance of $673.97, but there was an item of interest included, amounting to $24.87, which Sanford deducted, leaving a balance of $649.06. I looked it over, and saw there was interest charged up twice, as I supposed, and Sanford made the correction.'' He further testified that he was satisfied at the time he signed the contract that $649.06 was not the correct amount owing by Rohrbaugh to plaintiff, and that he signed the contract under protest. Again, he said: ''I had suspicions from the very first time that Sanford brought the contract up. I suspicioned that it was not right, but I didn't know how I could get at it to find out anything then, as I couldn't see the books.'' Some three weeks after the contract was made, the secretary of the company wrote to witness, who was then in Chicago. ''I learned from this letter that the statement made me (by Sanford) was incorrect, and that Rohrbaugh didn't owe him any such amount. The letter did not give me the source of information, and I returned here again in January following, and when I got back Kepner (the secretary) and myself talked the matter over, and this was the time I went to Sanford to see his books. He had always refused to let me see them.''

On April 1, 1894, defendant began making the payments

required by the contract.    On June 1st the unpaid balance of
the $649.06 was $399.07.    Defendant paid $53.99, and wrote
the following receipt, which plaintiff signed:    "June 1, 1894.
Gates, Townsend & Co. to John R. Sanford, Dr.    June Int.
on $399.07, $3.99;  June installment, $50.00—$53.99.  Paid.
J. R. Sanford."

On  July 1st  there was unpaid of  the $649.06 the  sum of
$349.    Defendant then paid $53.49, and took from plaintiff a
receipt showing that $50 was for the July installment and the
$3.49 for interest.    This receipt also was written by the wit-
ness.    The last payment was made September 5, 1894.    "Up
to the time I refused these  payments, I  had a suspicion that
this amount was not correct.    I never knew, but I suspicioned
that it was not right, and for the  purpose of  investigating it
I refused  to pay these last  payments.    *    *    *    The first
time I became fully satisfied of it was after the books had been
examined."    After plaintiff  moved  the court to instruct the
jury to find for him, the court permitted the witness to be re-
called. He then testified that just before the contract was signed
he asked Rohrbaugh what was due, and Rohrbaugh said, "Not
far from $400."    "Then, when the contract was presented to
me, it was so much larger than what had been represented to
me, I was  suspicious that  there was something wrong, and
afterwards was satisfied  that it must be right, and  signed it.
This occurred from  my conversations with  Sanford.    After-
wards so many things came to my mind that the thing was not
right, and that I was  being swindled out of  some money, I
thought I would  contest it, and  see what there was in it.    I
told Sanford every time we met that  I would like to see the
accounts.    I asked him every time I saw him that I would like
to see the books.    I think I told  him before signing the con-
tract that I wanted to see  his books.    I asked him  a great
many times.    I did not see them.    He would not let me."

1.    The contract upon which the action is based is attacked
as unconscionable, because it provides that, if the company
fails to make any of its payments, all sums paid prior to de-
fault shall be forfeited as part of the damages for the use of

the goods, and the goods shall be returned to the plaintiff. Whether or not the courts will enforce the forfeiture clause with respect to the payments made is not a question presented upon this appeal. The contract expressly confers upon plaintiff the right to take the chattels upon default of defendant. We do not think that this right is subject to a settlement with the defendant with respect to such payments. When the purchaser or bailee fails to make the payments required by the contract, the seller or bailor may, in replevin, recover possession of the chattels. (*Puffer* v. *Reeve*, 35 Hun. 480; *Ballard* v. *Burgett*, 40 N. Y. 314; *Austin* v. *Dye*, 46 N. Y. 500; *Thirlby* v. *Rainbow* (Mich.) 53 N. W. Rep. 159; *Ryan* v. *Wayson* (Mich.) 66 N. W. Rep. 370. This conclusion is supported by the rulings in *Heinbockle* v. *Zugbaum*, 5 Mont 344, 5 Pac. 879; *Silver Bow M. & M. Co.* v. *Lowry*, 6 Mont. 288, 12 Pac. 652, and *Miles* v. *Edsall*, 7 Mont. 185, 14 Pac. 701.)

2.   That the defense interposed by the answer is equitable in its nature is conceded by the parties. Although defendant asks the court to declare the contract null and void, the failure to offer a return of the goods obtained under it, or to give an excuse for the omission to do so, renders the defense pleaded unavailing for purposes of rescission. Indeed, relief by rescission would not benefit defendant, for the title to the goods was in plaintiff when the contract was made. His title does not come from or depend on the contract. If the contract were declared void, the chattels would go to plaintiff, and defendant might have an action to recover whatever he has paid for them. So, if the contract were rescinded, plaintiff must necessarily recover possession of the property.

The plaintiff urges that the complaint does not state facts which would, if proved, authorize a reformation of the contract, for the reason that defendant knew exactly what the language and import of the writing was, and that, therefore, there was no mistake, induced by fraud or otherwise, as to the terms and conditions of the contract, and hence the writing must stand as the only evidence of the only contract that was entered into. This view of the jurisdiction of equity is too

narrow.   In our opinion, the answer states facts sufficient, if
proved, to warrant the remedy of reformation.   True, the
written contract was fully understood by defendant at the time.
It intended to sign just the paper it did sign.   But this willingness
of defendant was, it is alleged, brought about by the fraudu-
lent misrepresentations of plaintiff upon which the defendant
relied.   The defendant all eges that the real contract between
the parties was that defendant should pay the plaintiff what-
ever was owing by Rohrbaugh to plaintiff, and that $449.06
was the amount of the debt.   The court will look beyond the
question whether the party knew and understood the words
employed to the true intention of the parties when they agreed
upon the words.   ''If the instrument does not express the
true intention, although there was no slip of the pen or mis-
take made in merely writing words, the instrument will be
reformed.''   (*Dunn* v. *O'Mara*, 70 Ill. App. 609.)   In
the case of *Graham* v. *Guinn* (Tenn.) 43 S. W. 749,
the court said:   ''But this state of willingness upon the part
of the complainant was superinduced by the fraudulent state-
ment of the defendant that these figures represented one-half
of the value of the property agreed upon as a basis of the con-
tract—that is, one-half of what defendant had agreed to give
Barrett—together with one-half of the expense of moving the
plant.   Under the authorities above cited, and on principle,
we think there is no doubt that the complainant is entitled to
a reformation.''

Defendant claims that the real contract was that it was to
pay $449.06, instead of $649.06, as stated in the contract sued
on, and that it was induced to sign the latter by fraudulent
representations.   The relief which it seeks is reformation,
so that $449.06 shall take the place of $649.06, and then the
enforcement of the contract as reformed.   This is evidently
the view taken by the court on the former appeal.   (See *San-
ford* v. *Gates*, 18 Mont. 398, 45 Pac. 559.)   As suggested
by respondent's counsel, this court did not intend to say that,
if a written contract be entered into, and by the fraud of one
of the parties it fails to express the true agreement, the writ-

ten instrument is to be disregarded, and recovery had upon oral proof of the real agreement. The agreement must not be confounded with the written evidence of it. Upon certain conditions the agreement may be repudiated, and rescinded for fraud; but, if any rights are claimed thereunder, the written instrument is the only evidence of the terms of that agreement. If by fraud the writing speaks falsely, it must be reformed; recovery cannot be had upon an oral agreement differing in its terms from the written evidence of it made by the parties. These remarks do not apply to, nor are we considering, a case where an oral contract is made, and, instead of the contract being reduced to writing, as the parties contemplated, there is fraud touching the execution of the instrument, such as misreading, the surreptitious substitution of one paper for another, or obtaining by some trick or device an instrument which the party did not intend to give. (*George* v. *Tate*, 102 U. S. 564.) In such cases it may be that reformation is not prerequisite to recovery on the actual contract, for the reason that the written instrument was not intended to be made.

Defendant complains that the question whether the false representations of plaintiff induced it to make the contract should have been submitted to the jury. Learned counsel insists that the defendant was deprived of a constitutional, legal, and sacred right by the action of the trial court in refusing to permit the jury to pass upon that question of fact. The defense was equitable. Where an equitable defense is interposed, the court exercises the power and jurisdiction of a chancellor, and may or may not, according to its discretion, order issues to a jury. If the remedy sought be equitable, the court is not bound to call a jury, and, if it does call one, it is only for the purpose of enlightening its conscience, and not to control its judgment. The decree which it must render upon the law and the facts must proceed from its own judgment respecting them, and not from the judgment of others. (*Gallagher* v. *Basey*, 1 Mont. 457; *Basey* v. *Gallagher*, 20 Wall. 670.) The court must determine the issues

for itself, and therefore the court may direct a verdict, though the evidence be conflicting. This conclusion inevitably follows from the doctrine announced in *Basey* v. *Gallagher, supra; Fabian* v. *Collins*, 3 Mont. 215; *Mantle* v. *Noyes*, 5 Mont. 274, 5 Pac. 856; *Beck* v. *Beck*, 6 Mont. 318, 12 Pac. 694; *Arnold* v. *Sinclair*, 12 Mont. 277, 29 Pac. 1124; *Leggatt* v. *Leggatt*, 13 Mont. 190, 33 Pac. 5; *Kleinschmidt* v. *Greiser*, 14 Mont. 494, 37 Pac. 5; *Zickler* v. *Deegan*, 16 Mont. 198, 40 Pac. 410; and the rule is well expressed in *Galvin* v. *Palmer*, 113 Cal. 46, 45 Pac. 172. In that case the jury had rendered a verdict by direction of the court below, and judgment was entered in accordance therewith. The court say: "While it is true that in actions at law, where a trial by jury is a matter of right to either party, it is error for the court to instruct the jury to render its verdict for one or the other when the evidence is conflicting, the rule does not obtain where, in equity, a jury is impaneled merely as a body advisory to the court, to assist it in determining disputed facts. In such cases the court may, even under conflicting evidence, reject the verdicts, general or special, of the jury, and enter a decree in accordance with its own determination, or, what is an equivalent, it may direct a particular verdict upon the facts as being in accord with its own conclusions. There was no error, therefore, in the court's instruction, even if it be conceded that the evidence was conflicting." Unless, as a matter of law, the evidence was such as to require a finding for defendant, it cannot successfully complain of the action of the court in directing a verdict in conformity with its own views of the effect of the evidence; in other words, if defendant was entitled, upon the evidence adduced, to a decision establishing the truth of its defense, then the instruction was erroneous, but not otherwise. It was not so entitled if a substantial conflict existed as to any material averment of the defense.

To warrant reformation on the ground of deceit by means of false representation, it is essential that the false representation induced the party asking such relief to enter into the con-

tract sought to be reformed. He must have believed it to be true, and acted on the faith of it. In the absence of such belief and resultant action, he was not deceived. Such is the rule in all cases at law and in equity where the action or defense is founded upon fraud alleged to have been accomplished by means of false representations. (*Farrar* v. *Churchill*, 135 U. S. 615, 10 Sup. Ct. 771; *Humphrey* v. *Merriam*, 32 Minn. 197, 20 N. W. 138; 2 Beach Mod. Eq. Jur. Sec. 85; *Taylor* v. *Guest*, 58 N. Y. 262; Bigelow on Fraud, page 64.)

The court below had the advantage, not possessed by this court, of hearing the testimony orally delivered by the witness Gates, and of observing his demeanor and manner of testifying. The court found that defendant did not believe the false representations to be true when it entered into the contract. Gates was the president and managing officer of defendant. He alone represented it in all matters pertaining to the contract with plaintiff. The important question was, did he believe the false representations to be true, and act on them? Was he deceived by plaintiff? As presented in the record, his testimony is not without uncertainty, and self-contradiction. He testified that he was suspicious from the very first that plaintiff had fraudulently swelled the account against Rohrbaugh; that plaintiff always refused to permit an inspection of his books; that he was satisfied at the time he signed the contract that the amount stated was incorrect; that he accepted plaintiff's assurance, and signed the contract under protest. Eight and nine months afterwards he made payments on the contract, expressly recognizing its validity by preparing and accepting receipts for interest paid by him on the remainder of the $649.06. When recalled after plaintiff had argued the motion to direct the jury, Gates testified that he became satisfied from his conversations with plaintiff that the amount, $649.06, was correct, and that he then signed the agreement. The burden of proof, in both of the senses in which the term is used, rested upon the defendant, and the court found from the testimony of the managing officer of defendant that he did not believe the representation of plaintiff

to be true.   The trial court was the exclusive judge of the credibility of the witness and of the weight of his evidence. The evidence would warrant a finding to the contrary; that is to say, there was evidence tending to prove that defendant believed the false representation to be true.   There was also evidence, presented by the testimony of Gates, having a strong tendency to show disbelief and nonreliance.   To pass upon this conflict was the province of the trial court, and a duty peculiarly confided to it.   We cannot disturb its finding without disregarding a well-established and familiar principle.

The contemporaneous oral promise said to have been made by Sanford, to the effect that he would rectify any mistake in the amount, while it was evidence tending to prove fraud, may not be imported into the written contract, for the reason that it was not intended by the parties to be incorporated into that agreement; nor can the defendant be permitted to set up that he signed the contract in reliance upon an oral agreement, made at the time, relating to the subject of the contract, and qualifying or varying the instrument which he signed.   Where there is no fraud or mistake in the preparation of the instrument, and it appears that the party signing understood its language and purport, it cannot be reformed on the ground that he signed upon the faith of a contemporaneous oral promise which was not kept, nor may such promise be received in evidence to control the written contract.   In equity, as at law, a written contract merges all prior and contemporaneous negotiations and promises made by word of mouth in reference to the subject of the instrument.   The presumption is conclusive that the whole agreement is embraced in the writing; and while, in equity, a written contract may be canceled or reformed for fraud or mistake, it may not be canceled on the ground that the oral promise has not been kept, nor reformed on the ground that such promise was made, unless it be shown that its omission therefrom was by mistake, fraud or accident. It was not contemplated or intended by either party that the oral promise of plaintiff should be inserted in the contract. Defendant perhaps relied upon that promise.   If so, its duty

was to reduce the oral undertaking or promise to writing. As was said by Judge Rapallo in *Wilson* v. *Deen*, 74 N. Y. 531: "The very purpose of the rule which excludes evidence of such declarations is to avoid the uncertainties attendant upon such evidence, and equity will not set aside the important and well-settled rule for the purpose of relieving a party against a risk which, upon his own showing, if it be true, he has voluntarily incurred. It is only when through fraud or mistake a party has executed an instrument which he believes to be in accordance with the real agreement, but which is in fact different, that equity will relieve." It is to be observed, also, that the complaint is not based upon the theory that such reformation is desired.

We have given this case most careful consideration. The seeming injustice, from an ethical point of view, which defendant has suffered at the hands of plaintiff, strongly appeals to us, and we have endeavored to find an equitable ground or principle which could be invoked in this suit, and applied for its relief. We are unable to do so. The doctrines which govern the state of facts presented by the pleadings and evidence are well settled; and, while it may be conceded that they seem to work hardship in some individual instances, their wisdom cannot well be questioned. An established rule of law must operate equally upon all cases falling within it, without regard to the views entertained by the judges touching the supposed hardship occasioned in the particular case.

The judgment and order appealed from are affirmed.

*Affirmed.*

PEMBERTON, C. J., dissents.

HUNT, J.    I concur with reluctance, but am unable to reach any other conclusion than one of affirmance under the principles of law properly applicable.