DICK, Receiver, Respondent, v. KING, Appellant.

(No. 5,665.)

(Submitted May 21, 1925. Decided June 1, 1925.)

[236 Pac. 1093.]

*Written Contracts—Interpretation—When Testimony Inadmissible—Real Property—Broker's Contract—Statute of Frauds—Witnesses—Party cannot Contradict Own Witness—Counterclaims.*

Witnesses—In Absence of Showing of Surprise Party Producing Witness cannot Contradict His Testimony.
  1.  Before a party producing a witness may contradict his testimony he must make a showing that he was misled or taken by surprise by what the witness said.

Contracts—Evidence of Meaning not Permissible if Writing Free from Doubt—Admission of Testimony—When Harmless Error.
  2.  Resort to evidence as to the meaning of a written contract is never to be had when the meaning is free from doubt, and permitting a witness to testify as to his construction of such an instrument was error, but harmless, where the jury did not pass upon the evidence and returned a directed verdict.

Same—Counterclaim Based upon Superseded Contract not in Existence at Time of Commencement of Action not Maintainable.
  3.  A counterclaim must be in existence and matured at the time of the commencement of the action in which it is pleaded; therefore, where a counterclaim was based upon a contract which had been superseded by a subsequent one, the court properly excluded testimony offered in support of it.

Same—Evidence to Vary or Contradict Terms of Written Instrument.
  4.  Where a party *sui juris* makes a contract which is free from doubt and the validity of which is not attacked, abrogating a former one, and in it specific provision is made for settlement for work done by him under the first, he will not be permitted to introduce evidence to vary or contradict its terms by showing that there still existed liability in the other party for work done under the first.

Same—Courts cannot Relieve Party of Bad Bargain.
  5.  The mere fact that a party who was *sui juris* when he signed a contract made a bad bargain which imposes a hardship upon him does not justify a court in relieving him of his obligation under it.

---

1.  Impeachment of own witness, see note in 60 **Am. Dec.** 749; Ann. Cas. 1914B, 1120. See, also, 28 **R. C. L.** 642.

Contracts — Sale of Real Property on Commission — Statute of Frauds — Parol Testimony Inadmissible.
6. A contract to sell real estate belonging to another for a compensation must, under section 7519, Revised Codes, be in writing, otherwise it is void; and where such a contract is in parol, testimony in support of a cause of action based upon it is inadmissible.

Contracts, 13 **C. J.**, sec. 651, p. 611, n. 92.
Evidence, 22 **C. J.**, sec. 1468, p. 1111, n. 41; sec. 1570, p. 1177, n. 49.
Frauds, Statute of, 27 **C. J.**, sec. 129, p. 192, n. 72.
Recoupment, Set-off and Counterclaim, 34 **Cyc.**, p. 670, n. 76.
Witnesses, 40 **Cyc.**, p. 2766, n. 23.

*Appeal from District Court, Missoula County; Theodore Lentz, Judge.*

ACTION by the American Bank & Trust Company against R. F. King, in which George K. Dick, receiver, was substituted for plaintiff. From the judgment for plaintiff, defendant appeals. Affirmed.

*Messrs. Russell & Madeen* and *Mr. Don Loehl,* for Appellant, submitted a brief; *Mr. Charles A. Russell* argued the cause orally.

*Messrs. Mulroney & Mulroney,* for Respondent, submitted a brief; *Mr. E. R. Mulroney* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

About October 15, 1919, the American Bank & Trust Company of Missoula entered into a contract in writing with R. F. King, Richard Merton and E. L. Black, for certain logging and sawmill work. That contract, and the other contracts to which reference will be made, were in the name of F. J. White, the cashier of the bank, but were for the use and benefit of the bank and will be treated as made with the bank directly.

On December 4, 1919, a second contract was entered into by the bank and King, and on July 6, 1920, the bank and King

entered into a memorandum in writing. On November 6, 1919, King executed and delivered to the bank his promissory note for $2,500 for money loaned to him, or to him and his associates, but the note was signed by King alone. On November 24 that note was renewed, $1,000 additional advanced by the bank, and a new note was executed for $3,500, signed by King, Merton and Black. On January 17, 1920, that note was renewed, $1,500 additional advanced, and a new note executed for $5,000, signed by King alone. On July 6, 1920, the note for $5,000 was renewed, an additional indebtedness of $1,500 included with the amount, and a new note for $6,500 was executed and delivered to the bank by King. On February 17, 1921, that note was renewed by King, who at the same time executed and delivered to the bank a separate note for $326.45, representing accumulated interest. On August 17, 1921, the principal note for $6,500 was renewed again by King, who then executed and delivered to the bank a separate note for $260, representing further unpaid interest. This action was thereafter instituted by the bank to recover the amount due upon the principal note and each of the interest notes mentioned.

In addition to the defenses pleaded, which need not be mentioned here, the answer sets forth two counterclaims—one for $4,068.75, for work and labor done and materials furnished under the contract of October 15, 1919, and one for $1,700, for compensation alleged to be due for the sale of real estate belonging to the bank. The reply to the first counterclaim is in effect a general denial. In reply to the second counterclaim, the bank pleaded payment, and, further, that the contract for the sale of the real estate was not in writing, neither was there any note or memorandum thereof in writing made or signed by the bank or its agent.

At the opening of the trial, upon suggestion that the bank had failed, the name of the receiver in charge was substituted for the name of the bank.

Plaintiff made the formal proof necessary to establish a *prima facie* case, and defendant then sought to prove his first counterclaim, but his offered evidence was excluded. He then introduced evidence in support of his second counterclaim, but when it appeared therefrom that the agreement for the sale of the real estate rested in parol, the evidence was stricken and a verdict directed in favor of the plaintiff for the several amounts claimed. From the judgment which followed, the defendant appealed.

While there are numerous specifications of error, each directed to a specific ruling made by the trial court, they present but three questions: (1) Did the trial court err in refusing to permit the defendant to offer evidence to contradict testimony given by one of his own witnesses? (2) Did the court err in excluding evidence offered by the defendant in support of his first counterclaim? And (3) did the court err in striking the evidence introduced by the defendant in support of his second counterclaim?

1. The defendant called as one of his witnesses F. J. White, [1] the former cashier of the bank, and interrogated him at great length. In the course of his testimony White made statements concerning the circumstances under which the memorandum of July 6, 1920, was executed, and when defendant testified in his own behalf he sought to show that the statements made by White were not altogether true. The court refused to permit the evidence, and complaint is made of the ruling.

Section 10666, Revised Codes, provides: "The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section 10669." The section was construed by this court in *State* v. *Richardson*, 63 Mont. 322, 207 Pac. 124, and it was there held that before a party may contradict his own wit-

ness he must show that he had been misled or taken by surprise by the testimony given by the witness. There is not any such showing made in this instance, and defendant cannot predicate error upon the ruling.

In this connection it is contended that the court permitted [2]   White to place plaintiff's construction upon the language of the memorandum but denied the defendant the right to give his version of the meaning of that instrument. We think the trial court did commit technical error in permitting White to testify as he did, but the fact that the court committed one error is not any sound reason why it should have committed another one. The language of the memorandum is plain, simple and direct; it needs no interpretation, but explains itself. Hence the statutory rules for the interpretation or construction of a contract have no application to it.

In *Ming* v. *Pratt,* 22 Mont. 262, 56 Pac. 279, this court said: "As aids to an understanding of a written contract, but not to alter its terms, the surroundings of the parties, the subject matter, and even  prior and contemporaneous oral negotiations and promises illumining the design and intent, may perhaps be proved; but resort to such evidence is proper only when necessary, and is not permissible where the intention and understanding are explicitly declared upon the face of the writing itself. (See *Sanford* v. *Gates,* 21 Mont. 277, 53 Pac. 749.) 'Interpretation is the act of making intelligible what was before not understood, ambiguous, or not obvious. It is the method by which the meaning of language is ascertained.' (11 Am. & Eng. Ency. Law, 507.) Resort to interpretation is never to be had where the meaning is free from doubt; it is to be availed of only when, without its aid, the meaning or effect of the contract would be doubtful or uncertain," and these rules have been observed consistently ever since. (*Purdin* v. *Westwood R. & L. Co.,* 67 Mont. 553, 216 Pac. 326; *Wheeler* v. *James,* 70 Mont. 37, 223 Pac. 900.)

The error in permitting White to interpret the memorandum proved to be harmless, since the jury did not pass upon the evidence, but returned a verdict as directed by the court.

2. To establish his first counterclaim, defendant sought to [3] show the amount of logs cut and decked, and the amount of lumber sawed and delivered under the contract of October 15, 1919, the compensation to be paid him therefor, and the balance due to him. The trial court held, however, that defendant could not predicate a counterclaim upon the contract of October 15, 1919, and the correctness of that ruling is the subject of this inquiry.

It is the rule declared by statute (sec. 9138, Rev. Codes) that, to be valid, a counterclaim must be in existence and matured at the time of the commencement of the action in which it is pleaded. (*Cook-Reynolds Co.* v. *Wilson*, 67 Mont. 147, 214 Pac. 1104.) The present action was commenced October 4, 1921, and the question arises: Could defendant at that time predicate a counterclaim upon the provisions of the contract of October 15, 1919?

The record discloses without conflict that on December 4, 1919, a new contract was entered into between the bank and King, in terms somewhat similar to the terms of the contract of October 15, 1919; that this new contract recited that it superseded the former contract, and that the contract of October 15 "is hereby declared abrogated and of no further force or legal efficacy." Then on July 6, 1920, the bank and King entered into the memorandum in writing as follows:

"That it is mutually understood and agreed by and between the parties hereto that that certain contract entered into by these parties on the fourth day of December, 1919, is ended, terminated and of no further force or effect whatsoever for any purpose, each party having this day released the other from all liability thereunder."

There is not any attack made upon the validity of the contract of December 4 or the memorandum of July 6,

and this court must indulge the presumption that each party to that contract and to the memorandum understood the meaning of the terms employed and that they were employed advisedly, as expressing the intentions of the parties. In the contract of December 4, 1919, they declared that that contract superseded the contract of October 15. To "supersede" means to set aside, to displace, to make void, inefficacious or useless. (Webster's International Dictionary.) That this is just what the parties meant is evidenced further by the fact that they recited in their contract that the contract of October 15, "is hereby declared abrogated and of no further force or legal efficacy." Then, by the memorandum of July 6, 1920, they declared that the contract of December 4, 1919, "is ended, terminated and of no further force or effect whatsoever for any purpose, each party having this day released the other from all liability thereunder." It would seem impossible for parties to make their meaning plainer or their intentions more apparent.

It appears, then, that long prior to the time this action was commenced, the contract of October 15, 1919, had been wiped out of existence and was of no more force or effect than if it had never been executed, so far as plaintiff and King are concerned. It could not furnish a foundation for the counterclaim pleaded by King, and the ruling of the trial court was plainly correct.

It is urged, however, that the terms of the contract of December 4 disclose that the parties did not take into consideration the fact that a large amount of lumber had been sawed by the defendant and his partners under the contract of October 15; but we are unable to agree with counsel. If, as they declared, the contract of October 15 was abrogated and was to be of no further force or legal efficacy after December 4, then King and the bank must have considered fully everything done under the prior agreement. A different construction would render meaningless the language they em-

ployed. But, if further evidence in support of this conclusion were necessary, it is furnished by the terms of the contract of December 4. That contract does recognize the fact that certain work had been done under the contract of October 15, for which settlement had not been made, and provision was made for compensation as follows: "It is understood by the parties hereto that there are certain logs now decked at the mill, and that the said first party shall pay the second party for these logs at the rate of $7 per 1,000 feet thereof, and that they shall be included in the first 1,000,000 feet delivered hereunder." When the parties made specific provision for settlement for this work done under the contract of October 15, failed to mention anything further as unsettled, and then deliberately abrogated the former contract and declared that it should thereafter have "no further force or legal efficacy," they must be held to have meant just what they said.

If the terms used in the contract of December 4 were am-
[5] biguous, or the meaning of the contract uncertain, then there might be ground for the contention advanced that defendant should have been permitted to show that a settlement was not had for the lumber sawed under the contract of October 15; but such is not the case, and to admit evidence that a liability still existed for the work done under that contract would violate the elementary rule that evidence is not admissible to vary or contradict the terms of a written agreement. It may be that the contract of December 4 and the memorandum of July 6, impose a hardship upon the defendant, but he was *sui juris* when he signed those instruments, and it is one of the privileges of every man to make unwise contracts, and many avail themselves of the privilege. But the fact that the defendant made a bad bargain does not justify the courts in violating the elementary rules of law in order to enable him to escape the consequences of his own voluntary act.

3. As a second counterclaim, it is alleged in the answer that
[6] in 1919 King entered into an agreement with the bank

"to sell a certain ranch of and for the plaintiff [bank] for a sum in excess of $6,000; this defendant to have as his compensation for making the sale all that should be received for said ranch on a sale thereof in excess of $6,000." It is then alleged that defendant sold the ranch for $7,700; that the bank ratified the sale but failed and neglected to pay defendant the sum of $1,700 or any portion thereof.

It is suggested in argument that defendant acquired an interest in the ranch itself to the extent of $1,700, but the agreement pleaded is not open to such a construction. It is alleged that the agreement was that defendant should sell the ranch "of and for the plaintiff" for compensation, and, as if to add emphasis to this theory, defendant testified that the ranch belonged to the bank. The contract pleaded is the ordinary broker's contract for the sale of real estate for compensation; and section 7519, Revised Codes, declares: "The following contracts are invalid, unless the same, or some note or memorandum thereof, be in writing and subscribed by the party to be charged, or his agent: * * * 6. An agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation or a commission."

The burden was upon the defendant to prove a contract valid under the provision above, and, when his own testimony disclosed that the entire transaction was in parol, the court properly struck the evidence from the record. (*Newman v. Dunleavy,* 51 Mont. 149, 149 Pac. 970.)

The judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES GALEN, STARK and MATTHEWS concur.

MR. CHIEF JUSTICE CALLAWAY, being absent on account of illness, did not hear the argument and takes no part in the foregoing decision.