**UNITED STATES of America, Plaintiff,**

**v.**

**WILLARD E. FRASER COMPANY, a Corporation, and Willard Edward Fraser, Defendants.**

**Civ. No. 707.**

United States District Court
D. Montana,.
Billings Division.

Jan. 5, 1970.

Otis L. Packwood, U. S. Atty. and Eugene A. LaLonde, Asst. U. S. Atty., Billings, Mont., for plaintiff.

Kurth, Conner, Jones & Davidson, Billings, Mont., for defendants.

## ORDER AND OPINION

JAMESON, District Judge.

This is an action for the foreclosure of a mortgage executed by the defendant Willard E. Fraser Company and for the enforcement of a contract of guaranty executed by the defendant Willard Edward Fraser. A decree of foreclosure was entered against the defendant Willard E. Fraser Company on November 25, 1969, for the sum of $141,959.49. Foreclosure sale has been set for January 15, 1970.

Defendants did not question the liability of Willard E. Fraser Company or the amount of the indebtedness. The sole remaining question is whether the personal contract of guaranty may be enforced and a deficiency judgment entered against the defendant Willard E. Fraser in the event the property does not sell for a sufficient amount to satisfy the judgment entered against the corporate defendant.

The mortgaged property consists of a four story frame structure, known as the Fraser Building located at 802 North 29th Street, Billings, Montana, and an apartment located at 710 North 30th Street, Billings, Montana. The original office building was completed in 1948 according to government specifications for lease to the plaintiff. An addition was completed in 1957.[1] The plaintiff and defendant Willard E. Fraser[2] entered into a lease on May 6, 1947, for a term beginning July 1, 1947, and ending June 30, 1952, "subject to an annual appropriation to Indian Service[3] by the Congress of the United States, said ap-

---

1. The annex, constructed in 1957, was built according to government specifications to meet the expanding needs of the principal tenant, the Bureau of Indian Affairs. The modernization added elevator service for the occupants.

2. The Willard E. Fraser Company was organized in March, 1958. Sometime subsequent thereto the property was transferred to the corporation, which made the loan. All of the leases, how-

ever, were executed by Willard E. Fraser personally.

3. At the time the original lease was signed the Bureau of Indian Affairs occupied the entire building. After the lease was renewed and the annex constructed other federal agencies, the Federal Housing Administration, Fish & Wildlife Service, Farmer's Home Administration and The Bureau of Mines and Agriculture also occupied space in the building.

propriation to be for District Office purposes." [4]

Section 7 of the lease specified the annual rental and provided that "[t]he lessor agrees to rent, at the option of the lessee, these premises at a rate not exceeding the present annual rental less 10% during the years July 1, 1952 to June 30, 1957." After extensive negotiations between the Real Property Acquisition and Utilization Division of the General Services Administration and Willard E. Fraser,[5] beginning in July of 1951, the G.S.A. formally approved the renewal on April 25, 1952. The lease was signed October 1, 1952, by defendant Fraser and Lee A. Meyer, Chief of the Real Property Acquisition and Utilization Division, G.S.A.

Supplemental agreements were signed by Fraser and G.S.A. officials on July 23, 1956, and March 1, 1957. The latter extended the lease term for one year for a period ending June 30, 1958. On January 27, 1958, the parties agreed that the lease then existing was terminated effective at "the close of business" on that date. A new lease signed October 24, 1957, became effective the following day.

This final lease [6] between plaintiff and Fraser provided for a five year term beginning January 1, 1958, and ending December 31, 1962, with a limited option of renewal for one five year term, beginning January 1, 1963. A supplemental agreement (No. 4) dated August 25, 1959, amended the lease to provide for a term beginning September 1, 1959, and ending August 31, 1964, with an option for renewal for one five-year term beginning September 1, 1964, and providing that the option must be exercised "at least 120 days before the Lease would otherwise expire" and that the lessor could elect to reject the renewal within 30 days after receipt of written renewal notice.

By another supplemental agreement (No. 6) dated April 15, 1964, the term of the occupancy was extended to August 31, 1965, with a provision that the Government should have the right to terminate the lease at any time after December 31, 1964, upon 30 days written notice. Pursuant to this provision the lease was terminated on April 8, 1965.[7]

Prior to the construction of the annex and the new lease, the Government had advertised for bids. Only one, that of the defendants, provided sufficient space. It was accepted on June 26, 1957, by wire and confirmed two days later by letter.

It was necessary for the defendant corporation to borrow money to finance construction of the annex. Following interim financing, the corporation borrowed the sum of $150,000 from Washington Mutual Bank and on August 25, 1959, executed a promissory note for that amount, secured by a mortgage, and an assignment of the Government lease.

In 1961 the defendant corporation negotiated a loan with the Small Business Administration. Formal application was made on June 29, 1961, and approval was conditionally granted August 11, 1961. On November 10, 1961, a note was executed for $130,000 payable in monthly installments, with the balance due in ten

4. Originally the Bureau of Indian Affairs paid rental payments from its own appropriations. After August 31, 1951, the lease was transferred to the General Services Administration, Public Building Service for administration, pursuant to "Reorganization Plan 18". Thereafter the defendant Willard E. Fraser dealt with the G.S.A.

5. In a letter dated "30 November 1954" Mr. Fraser, in relation to a question of Government "jurisdiction" over two rooms in the basement used as a coffee shop, noted that although the original lease was with the Bureau of Indian Affairs, since then, "in line with Congressional action this lease has been taken over by the General Services Administration".

6. This lease covered the annex as well as the original building.

7. Supplemental agreement No. 7, executed May 11, 1965, contained a provision releasing the Government from any and all claims, except any unpaid debts for the period ending April 8, 1965.

years. On the same date the defendant corporation executed a real and personal property mortgage covering the office building leased to the Government and an apartment building owned by the Willard E. Fraser corporation.[8]

Willard Edward Fraser also signed, on November 10, 1961, a personal guaranty. It provided, in part that:

"In case the Debtor[9] shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms of said note, the undersigned, immediately upon the written demand of the SBA will pay to SBA the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the undersigned."

The loan from S.B.A., designed to lower the defendant's interest and principal payments, was to be repaid primarily from the lease money paid by the Government for the office space in the Fraser Building, including the annex. By agreement, the funds were paid directly into the corporate defendant's account to satisfy the S.B.A. loan.

In the early 1960's [10] the Government planned and constructed a new five story Federal Office Building, designed to house many of the federal agencies scattered throughout the city of Billings. The agencies housed in the Fraser Building were among those transferred to the new building, leaving their old quarters unoccupied. The defendants attempted to rent office space and sell the building, both to no avail. No other federal agency has been housed in the building, although not all agencies have space in the new facility.

The defendant in his amended answer to the complaint alleges that "plaintiff stated and represented to defendant Willard Edward Fraser that the plaintiff would continue to occupy the premises located on the property mortgaged to the plaintiff by the defendant Willard E. Fraser Company, throughout the life of the mortgage and beyond; that said representations were false and were not at the time of making the same believed to be true by the plaintiff and that said representations were made to induce this defendant to execute said guaranty contract, and in reliance upon the truth of said statement answering defendant executed said agreement." A second defense advanced is that the Government, through the construction of the Federal Office Building and the removal of the lessee from the premises of the defendant, "wilfully and negligently" reduced the property's value without taking "reasonable action to preserve the mortgaged property's value".

It is the defendant's major contention that personnel from the General Services Administration, Bureau of Indian Affairs and Small Business Administration assured him that the plaintiff's leases would continue until after the financing loan for the construction was paid.

It is undisputed, as defendant states in his post trial brief, that "The relationship between the landlord and the government personnel of the Bureau of Indian Affairs and General Service Agency was of long duration and an exceedingly friendly one." Fraser cooperated fully with his lessee in supplying adequate floor space and in complying with numerous requests for additional services and structure modifications.

---

8. A supplemental chattel mortgage covering personal property located at 802 North 29th Street, the office building, and 710 North 30th Street, the apartment house, was executed on December 8, 1961.

9. The debtor was identified as "Willard E. Fraser Company (a Corporation), Billings, Montana."

10. The evidence does not show when construction was authorized or commenced. The G.S.A. file contains a letter from Mr. Fraser dated January 26, 1960, requesting the names of persons leasing space to the Government in Billings and the amount of space covered by each lease. A notation on this letter, apparently made by the recipient, indicates that there had been a "release on the new building".

Over objection, Fraser testified that representatives of G.S.A. on several occasions in 1958 and 1959, both in Seattle and Billings, told him that the Government could not afford to erect a federal office building in Billings, in view of the low rentals, and that there was no reason to doubt that the Bureau of Indian Affairs would continue as a tenant in the Fraser Building until the loan was paid. No G.S.A. witness testified at the trial,[11] but the assistant area director of the Bureau of Indian Affairs testified, over objection, that there was "a general understanding" that the Government would be in the Fraser Building for a long time.[12] In its post trial brief, the Government concedes that various agency personnel may have made such statements, but contends that they lacked authority to bind the Government and that Fraser knew that they could not bind the Government and that the lease contract was not altered by the various oral assurances.

If the testimony relative to the oral statements is admissible, the evidence would support a finding that the defendant Fraser was assured by the representatives of General Services Administration who negotiated the last lease, as well as by personnel of the Bureau of Indian Affairs, that the Fraser Building would be occupied by the Government until such time as the loan in question was paid.

Essentially the issue here is whether these various statements can be considered in light of the written lease and the parol evidence rule.

Section 93–401–13, Revised Codes of Montana, 1947 provides in part:

"An agreement reduced to writing deemed the whole. When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings.

"2. Where the validity of the agreement is the fact in dispute.

"But this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in section 93–401–17,[13] or to explain an extrinsic ambiguity, or to establish illegality or fraud. * * *"

█ The reasons for the parol evidence rule and its effect were well summarized by the Supreme Court of Montana in Webber v. Killorn, 1923, 66 Mont. 130, 132, 133, 212 P. 852, 853, where the court said:

"The principle is well established and of general application, subject to certain exceptions, that when a contract has been reduced to writing the contents of such writing cannot be added to, contradicted, altered, or varied by parol or extrinsic evidence, and that such writing supersedes all oral negotiations concerning its matter which preceded, accompanied, or led up to its execution. This was the rule at common law, and has been embodied

---

11. In answer to interrogatories Fraser had given plaintiff the names of the G.S.A. representatives who made the alleged statements. The Government, however, took the position that all oral statements were inadmissible under the parol evidence rule.

12. On cross-examination he testified that the B.I.A. did not negotiate the last lease and that he recognized he did not

have authority to assure continued occupancy.

13. Section 93–401–17 provides: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

in the statute law of this state." (Citations omitted).

"The reason for the adoption of this salutary rule, which by its rigidity sometimes appears to work an injustice, is that by long experience it has been found that written evidence is so much more certain and accurate than that which rests in the memory only that it would be unsafe, when parties have expressed the terms of their contract in writing, to admit weaker evidence to control and vary the stronger, and to show that the parties intended a different contract from that expressed *in the writing signed by them.*" (Citations omitted).[14]

The oral statements and assurances in this case do not come within any of the recognized exceptions to the parol evidence rule. The defendant Fraser has not alleged mistake or imperfection in the writing; nor does he question the validity of the agreement. No ambiguity is pleaded, and defendant has not offered the parol evidence as "other evidence of the circumstances under which the agreement was made" under section 93–401–17, R.C.M.1947.[15] The only exception defendant possibly invokes is that the circumstances may establish fraud.[16]

This court had occasion in the cases of C.M.C., et al. v. Electronics & Missile Facilities, Inc., Great Falls Civil No. 2356, and American Casualty Company, etc. v. Electronics & Missile Facilities, Inc., et al., Civil No. 2346, to consider in some detail the question of fraud in the inducement of a contract. In view of the fact that this opinion was not published, there is attached hereto as an appendix excerpts from the opinion filed December 6, 1965.

In my opinion the rules therein stated are applicable in this case. The fraud alleged does not consist of any false representation with respect to a present or past act; nor do the oral representations upon which defendant relies relate to any collateral or intrinsic matters not dealt with in the written contract.

The contract itself contains the subject matter of the alleged misrepresentations. The defendant Fraser frankly admitted on cross-examination that he knew the written contract would be controlling and that he could not enforce the oral representations and agreement. Under these circumstances he did not have a right to rely upon the oral misrepresentations as to future facts.

Defendant Fraser contends further that by reason of the "assurances by the government personnel that the government would be tenants for a period in excess of any executed lease," the Government is estopped to claim a deficiency judgment against Fraser and should be "left with its remedy against the building itself". The defense of estoppel is in many respects similar to that of fraud in the inducement of the contract. 28 Am.Jur.2d p. 627, Estoppel and Waiver, § 27, defines equitable estoppel as:

" * * * the principle by which a party who knows or should know the truth is absolutely precluded, both at law and in equity, from denying, or asserting the contrary of, any material fact which, by his words or conduct, affirmative or negative, intentionally

---

14. See also Thisted v. Country Club Tower Corp., 1965, 146 Mont. 87, 405 P.2d 432, and cases there cited.

15. See Ryan v. Ald, Inc., 1965, 146 Mont. 299, 303, 406 P.2d 373, where the court, directing its attention to section 93–401–17 held: "This statute is applicable only when the instrument requires construction. First National Bank v. [Green Mountain] Soil Conservation District, 130 Mont. 1, 293 P.2d 289. Here the contract needs no construction. Its terms are clear."

16. Although defendant's amended answer relies on fraud, his final brief asserts only that the circumstances show a relationship between the plaintiff and defendant was of "long duration and an exceedingly friendly one". The "aura *of mutual trust and respect" arising from* the landlord-tenant relationship does not establish evidence of fraud.

or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon them thereby, as a consequence reasonably to be anticipated, changing his position in such a way that he would suffer injury if such denial or contrary assertion was allowed." [17]

■ The defendant's evidence fails to establish that he had a right to rely upon any false statements or misrepresentations or that they were made by the Government personnel "intentionally or through culpable negligence" to induce Fraser to enter into the lease agreement. There is no evidence that the Government personnel who gave Fraser the oral assurances or promises knew that they were false when the statements were made. Moreover, as noted supra, Fraser admitted that he knew the written lease would be controlling and that he did not have a right to rely upon the oral representations. He lacked "the excusable ignorance" which forms an essential element in the defense of estoppel.

Finally the defendant argues that the case falls within the rule cited in United States v. Fyles, D.Ver.1965, 253 F.Supp. 386, 390, that " '[w]here the creditor has security from the principal and knows of the surety's obligation, the surety's obligation is reduced pro tanto if the creditor * * *. (c) fails to take reasonable action to preserve its value at a time when the surety does not have an opportunity to take such action.' " [18]

Fyles is factually distinguishable. In that case the S.B.A. held two notes, secured by a mortgage on a sawmill and equipment and guaranteed by the defendants. While the mill was worth more than the amount of the notes, the guarantors who ran the business were unable to repay the loan. The notes matured. Fire insurance on the mill lapsed and the S.B.A. was notified both of the lapse and of the sureties' inability to pay the insurance premiums. [19] The S.B.A. refused to pay the premiums, contrary to the sureties' request and a commercial practice of insuring collateral where the collateral would satisfy both the obligation and the premium payments. Fire destroyed the mill and after a sale of the property, the S.B.A. sought to collect the deficiency. The rule quoted above was relied on in denying recovery.

■ The instant case does not involve the failure of the Government to take any required action to preserve the security. The Government was not required to provide tenants for the building beyond the term of the written lease. At the expiration of each lease term the Government could vacate the building without liability. Its position was not changed merely because it built a new office building which depressed rental values and removed tenants from private lessors.

Deficiency judgments were upheld in somewhat similar factual situations in Deseret Apartments v. United States, 10 Cir. 1957, 250 F.2d 457; and Henry Barracks Housing Corp. v. United States, 1960, 281 F.2d 196, 150 Ct.Cl. 689. In each case, government housing was needed for a military installation. A certificate of need issued, thereby making available F.H.A. mortgage insurance. The certificates were issued in good faith, believing that the need would continue. Defendants obtained loans and constructed the housing. The housing proved unnecessary and foreclosure and

---

17. For a discussion of the essential elements of "equitable estoppel", see also Cedar Creek Oil & Gas Co. v. Fidelity Gas Co., 9 Cir. 1957, 249 F.2d 277, cert. denied, 356 U.S. 932, 78 S.Ct. 775, 2 L.Ed.2d 763 (1958), and Hustad v. Reed, 1958, 133 Mont. 211, 321 P.2d 1083.

18. Citing Restatement of Security, Section 132.

19. Two of the guarantors did not know that the policies of insurance had been cancelled. The others were financially unable to pay the premium.

default judgments were entered. Both cases held that the certificate of need merely satisfied F.H.A. requirements and that they were not a guarantee of continued need. The deficiency judgments against the guarantors were affirmed.[20]

It may be noted also that any oral representations and assurances were not made by representatives of the Small Business Administration, the loaning agency, but rather by personnel in the leasing agencies, and that they related to the lease agreement and not the loan agreement. It may well be that the defendant Fraser's remedy, if any would have been an action for reformation of the lease agreement and damages for breach of the agreement. In view of my conclusion that the evidence of any oral statements would in any event be inadmissible under the parol evidence rule, it is unnecessary to consider this question of remedy.

The court concludes:

(1) The testimony relative to oral representations and assurances by personnel of the Bureau of Indian Affairs and General Services Administration that the government would occupy the Federal Building until the loan was paid is inadmissible under the parol evidence rule in that it would alter and contradict the terms of an express written contract.[21]

 (2) The Government is not bound by any oral representations and assurances which may have been made by the personnel of the Bureau of Indian Affairs and General Services Administration.

(3) The contract of guaranty executed by the defendant Willard E. Fraser is enforceable, and the Government is entitled to a deficiency judgment for any balance remaining unpaid upon the sale of the mortgaged property.[22]

This opinion shall constitute the court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure. Counsel for plaintiff will prepare, serve and lodge form of judgment in accordance with this opinion.

While the court has concluded that as a matter of law the contract of guaranty must be enforced, there are equitable considerations which the Government might properly consider in submitting its bid on sale of the mortgaged premises and in negotiating a possible settlement with the defendant Fraser.[23] Fraser testified that the cost of the annex in 1958 was between $170,000 and $180,000. The annex was constructed to comply with the Government's need and request for additional space. An appraisal made by the Acquisition and Disposal Branch of G.S.A. on November 3, 1960, estimated the "fair market value" of the leased space at $310,000. The amount of the judgment is approximately $141,000, but all parties assume that it is questionable

---

20. See also Bateson-Stolte, Inc. v. United States, 1962, 305 F.2d 386, 158 Ct.Cl. 455 and order and opinion of the District Court of Nevada in United States of America v. Sherman Gardens Company, 298 F.Supp. 1332 entered November 8, 1967. (Copy attached to plaintiff's post trial brief).

21. Extensive pretrial discovery, including the production and examination of all correspondence relating to the lease and loan agreements, failed to disclose any instrument in writing which would modify the terms of the express written agreements.

22. Section 93–6001, R.C.M.1947, provides for docketing a deficiency judgment where, after the foreclosure sale, "pro-

ceeds are insufficient, and a balance still remains due". It is true, as defendant points out in his brief, that a deficiency judgment is not allowed on the foreclosure of a purchase price mortgage (section 93–6008), but we are not here concerned with a purchase money mortgage.

23. In Deseret Apartments v. United States, supra, the trial court felt that as a matter of law the Government was entitled to prevail, but suggested that there were "equitable considerations which would lead the Court to grant relief" if he could properly do so, and he did not see why under the circumstances the government agencies "haven't been a little more considerate". (250 F.2d at 459).

whether the property will bring that amount at the foreclosure sale.

The foregoing supports the testimony at the trial that the construction of the Federal Building and removal of the tenants from the Fraser Building resulted in a substantial reduction in the value of the building. Although the Government continued to rent office space for some agencies, all tenants were removed from the Fraser Building. The defendants have been unable to sell or lease it.

There can be little question that both Fraser and the Government representatives who negotiated the last lease in 1958 were of the opinion that the lease would continue until the loan was paid. While Fraser could not rely upon that assumption in view of the written lease and loan agreements, it would seem proper for the Government to give consideration to the oral representations and assurances in negotiating an equitable settlement with Fraser.

### Appendix

Excerpts from opinion in C.M.C. Construction Co., et al v. Electronics & Missile Facilities, Inc., a corporation, Great Falls Civil No. 2356, and American Casualty Company, etc. v. Electronics & Missile Facilities, Inc., et al. Civil No. 2346. Filed December 15, 1965.

In general I have accepted the testimony of the C.M.C. partners. It is clear that Roth made numerous false promises and representations to the partners prior to the execution of the written agreement. I am satisfied they relied upon those promises in executing the contract. Did they have a legal right to do so?

Critical to a determination of the issue of fraud in the inducement of the contract is the testimony of the partners with reference to what transpired at the meeting on October 1, 1961. On that occasion Roth reaffirmed all of the promises and representations theretofore made. All of the partners protested E. M.F.'s failure to include Roth's oral promises in the written contract. Each was specifically discussed. Roth explained the failure to incorporate his oral promises in the written contract on the basis that their absence "didn't mean a thing"; that the written contract was desired in connection with the financing of the project; and that all of the oral promises would be fulfilled by E.M.F.

It should be noted at the outset that this is not a case (1) where the contract is ambiguous and requires construction; or (2) where the innocent party did not know what was in the contract; or (3) where one party had made false representations or warranties with respect to the title or condition of property or some other misrepresentation of a past or present fact; or (4) where the oral agreement relates to collateral or intrinsic matters not dealt with in the written contract. Rather it is a case where C.M.C. relied upon the assurance of an agent of E.M.F. that the absence of the oral promises the agent had made did not mean anything and that E.M.F. would "fulfill all of them", even though they were not mentioned in the written contract.

\* \* \* \* \* \*

With respect to the issue of fraud in the inducement of the contract, we are concerned with three related questions: (1) May the court consider evidence of fraudulent promises and misrepresentations which are at variance with the terms of the written contract; (2) Were the fraudulent promises and misrepresentations made by Roth of the type which might be admissible in evidence as an exception to the parol evidence rule; \* \* \*

The Montana Statutes are clear with respect to the effect of reducing a contract to writing. Section 13–607 R.C.M. 1947 reads: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

Section 93–401–13 provides:

"When the terms of an agreement have been reduced to writing by the

parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings.

"2. Where the validity of the agreement is the fact in dispute.

"But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in section 93–401–17, or to explain an extrinsic ambiguity, or to establish illegality or fraud. * * * "

These statutes have been construed in many Montana cases. No case has been cited by counsel, nor have I found any precisely in point under the factual situation here presented. Certain general principles, however, are well established by the Montana decisions.

■ It is well settled that in "determining whether the terms of a written instrument are varied by parol testimony, 'the * * * most satisfactory index is found in the circumstance whether or not the particular element of the alleged extrinsic negotiation is dealt with at all in the writing. If it is mentioned, covered, or dealt with in the writing, then presumably the writing was meant to represent all of the transaction on that element'. " (Citing cases). Warner v. Johns, 1949, 122 Mont. 283, 289, 201 P.2d 986, 988.

In Kelly v. Ellis, et al., 1909, 39 Mont. 597, 104 P. 873, the plaintiff brought an action for deceit, alleging that he had entered into an oral contract, the provisions of which were subsequently reduced to writing, for the sale of a sheep ranch; that in the oral negotiations it was understood and agreed that after the sale defendant would make him manager of the sheep ranch; that this promise was a "most important condition of the agreement", and but for the promise he would not have sold the property. The trial court sustained a demurrer to the complaint. In affirming, the Supreme Court, after quoting the statutes set forth above, said in part:

"There is not any attack made upon the validity of the written agreement; and, since it appears from the complaint that at the time the plaintiff signed the written contract upon April 17th he fully understood and appreciated that it did not contain any provision for his employment as local manager, but nevertheless voluntarily signed it, he will not be heard to say now that such writing does not contain all the terms of the agreement for the sale of his real and personal property in Sweet Grass county, and he cannot bring himself within either of the exceptions noted in the statute above. However, the writing of April 17th, only superseded all the oral negotiations and stipulations between the parties so far as such negotiations and stipulations related *to the matter of their agreement*. The Code so provides in unmistakable terms: 'The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.' (Revised Codes, sec. 5018.) It did not necessarily supersede all their prior or contemporaneous negotiations; and, if the defendants by fraud or deceit, with respect to some collateral matter, induced the plaintiff to sign the writing, then he might be heard to complain." (39 Mont. at 605–606, 104 P. at 875).

Kelly v. Ellis was followed by the Montana court in Biering v. Ringling, 1927, 78 Mont. 145, 252 P. 872, where the court said in part:

"It is the province of courts to enforce the contract as made by the parties, and not to make new ones for

them, no matter how unreasonable the terms may appear from a business standpoint as to either of the parties. McConnell v. Blackley, 66 Mont. 510, 214 P. 64, and Montana cases there collected. The court must assume that the parties understood the terms of the contract and its effect, Friesen v. Hart-Parr Co., 64 Mont. 373, 209 P. 986. The parties being *sui juris*, the courts are not in a position to afford them relief from the effects of unwise or improvident contracts; it being rather their duty to hold the parties to the strict terms of their written agreements when the language of the contract is understandable and free from ambiguity. Hinerman v. Baldwin, 67 Mont. 417, 215 P. 1103; Dick v. King, 73 Mont. 456, 236 P. 1093.

\* \* \* \* \* \*

"A party to a written contract who claims that it does not correctly state the true terms of the agreement, and that he was led to sign the same by the fraudulent representations of the other party thereto, cannot recover upon the oral agreement, but must first have the written agreement reformed. Recovery cannot be had upon an oral agreement differing in its terms from the written evidence of it as made by the parties. Sanford v. Gates, Townsend & Co., 21 Mont. 277, 53 P. 749; Ford v. Drake, 46 Mont. 314, 127 P. 1019. If, through fraud or mistake, a writing does not truly express a party's intention, it may, in view of section 8726 of the Revised Codes of 1921,[1] on application of the party aggrieved, be revised so as to express such intention. McDaniel v. Hager-Stevenson Oil Co., 75 Mont. 356, 243 P. 582." (78 Mont. at 153–155, 252 P. at 875.)

■ These cases are in accord with the general rule that parol evidence is inadmissible when "the alleged fraud concerns a promise or representation directly at variance with the terms of the written instrument". 32A C.J.S. Evidence § 979, p. 473.[2] It is necessary in this connection to distinguish between misrepresentations of past and present facts and misrepresentations or promises as to future facts. This distinction is recognized in IX Wigmore, Evidence, § 2439, at 126 (3d ed., 1940):

"It may be added that the term 'fraud' must here be understood in its legitimate narrow sense, *i. e.* a misrepresentation of a *present* or *past fact;* for, although a much looser significance has been occasionally intimated, yet it is obvious that an intent not to perform a promise (*i. e.* a misrepresentation as to a future fact), or a subsequent failure knowingly to perform an extrinsic agreement not embodied in the writing, cannot in strictness be legally included in the term 'fraud'."

Wigmore has been quoted with approval in a number of California cases, including Bank of America Nat. Trust &

---

1. Section 8726 R.C.M.1921 is now Section 17–901 R.C.M.1947 and reads: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, while the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." In discussing the extent of the remedy available pursuant to this section the Montana court in Comerford v. United States Fidelity & Guaranty Co., 1921,

59 Mont. 243, 260, 196 P. 984, stated: "The court merely makes the instrument just what the parties intended it to be. Neither will the court insert a provision which was omitted with the consent of the party asking reformation, although such consent was given in reliance on an oral promise of the other party that the omission should not make any difference." The Comerford case was cited with approval in Bartelme v. Merced Irr. Dist., 9 Cir. 1929, 31 F.2d 10, 13.

2. It is recognized that there are cases contra, but this is the rule followed in Montana and California.

Sav. Ass'n v. Pendergrass, 1935, 4 Cal.2d 258, 48 P.2d 659, where the Supreme Court of California, in construing statutes similar to those in Montana, said further:

" * * * Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument, or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing. We find apt language in Towner v. Lucas' Ex'r, 54 Va. (13 Grat.) 705, 716, in which to express our conviction: 'It is reasoning in a circle, to argue that fraud is made out, when it is shown by oral testimony that the obligee cotemporaneously with the execution of a bond promised not to enforce it. Such a principle would nullify the rule: for conceding that such an agreement is proved, or any other contradicting the written instrument, the party seeking to enforce the written agreement according to its terms, would always be guilty of fraud. The true question is, Was there any such agreement? And this can only be established by legitimate testimony. For reasons founded in wisdom and to prevent frauds and perjuries, the rules of the common law exclude such oral testimony of the alleged agreement; and as it cannot be proved by legal evidence, the agreement itself in legal contemplation cannot be regarded as existing in fact. Neither a court of law or of equity can act upon the hypothesis of fraud where there is no legal proof of it.' " (48 P.2d at 661–662.) [3]

In addition to the statutes relating to the effect of a written contract and the parol evidence rule, we are of course concerned with the Montana Statutes relating to contracts obtained through fraud. Under Montana law consent of a party to a contract is not "free" if it is obtained through fraud. R.C.M.1947, section 13–303. Actual fraud "consists in any of the following acts, committed by a party to the contract, or with his connivance with intent to deceive another party thereto, or to induce him to enter into the contract:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;

3. The suppression of that which is true, by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or,

5. Any other act fitted to deceive." (R.C.M.1947, Section 13–308.)

In order to establish a prima facie case of actual fraud it is well settled that the party seeking to avoid the contract must prove: "(1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity, or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury." Lee v. Stockmen's Nat. Bank, 1922, 63 Mont. 262, 284, 207 P. 623, 630; Helena Adjustment Co. v. Claflin, 1926, 75 Mont. 317, 324, 243 P. 1063; Morigeau v. Lozar, 1928, 81 Mont. 434, 440, 263 P. 985. The final determination of whether there was actual fraud is always a question of fact. R.C. M.1947, Section 13–310. Lee v. Stock-

3. See also Citizens Nat. Trust & Sav. Bank of Los Angeles v. Londono, 9 Cir. 1953, 204 F.2d 377, cert. den. 346 U.S. 866, 74 S.Ct. 105, 98 L.Ed. 376.

men's Nat. Bank, supra; Harrison v. Riddell, 1922, 64 Mont. 466, 210 P. 460.

We may assume, without further discussion, that C.M.C. has proved all of the essential elements of fraud except (8), i. e. the right to rely upon the promises and representations made by Roth. As noted supra, all of the C.M.C. partners were mature men, with a high school education and prior business experience, even though they had not had prior experience in bidding on a government project. They read the proposed contract and specifically protested the absence of all of the oral promises and representations upon which they now rely in support of their contention of fraud. It is clear from their own testimony that they appreciated the significance of a written contract, but they were persuaded by Roth that the contract "didn't mean anything" and the E.M.F. would fulfill Roth's oral promises contrary to the provisions of the contract. It is of course unfortunate that they did not consult counsel before signing the contract.

It has been frequently stated by the Montana court that "when it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself, *or that the means were at hand to ascertain the truth * * of any representations made to him,* his reliance upon such representations made to him, however false they may have been, affords no ground of complaint." (Citing cases.) (Emphasis added.) Lee v. Stockmen's Nat. Bank, supra, at 63 Mont. 284, 207 P. 630. Helena Adjustment Co. v. Claflin, supra, at 75 Mont. 324–325, 243 P. 1063; Carbon County v. Draper, 1929, 84 Mont. 413, 422, 276 P. 667.[4]

There is no evidence that C.M.C. at any time prior to suit made inquiry of

the officers of E.M.F. regarding Roth's authority or his oral promises and representations at variance with the written contract, or that C.M.C. complained to anyone except Roth and Spiegel that E. M.F. had failed to comply with the oral promises.

---

4. In United States v. Conklin, D.Mont. 1944, 54 F.Supp. 500, 502 an action seeking to cancel certain patents to land allegedly issued on the basis of fraudulent representations, the late Judge Pray of this court stated:

"* * * Where circumstances of a questionable nature, creating a suspicion of fraud, come to the attention of one whose duty it is to investigate, and where, if inquiry were made, the facts constituting the fraud would be disclosed, and such person fails to make such inquiry, the law charges him with full knowledge of whatever facts pertaining to the fraud would have been discovered."